**HARTFORD ACCIDENT AND INDEMNITY COMPANY and Hartford Fire Insurance Company, Plaintiffs,**

v.

**RJR NABISCO, INC. and F. Ross Johnson, Defendants.**

**No. 88 Civ. 8148.**

United States District Court, S.D. New York.

Sept. 13, 1989.

MEMORANDUM AND ORDER

WALKER, District Judge:

Defendant RJR Nabisco, Inc. ("RJR Nabisco") moves, pursuant to Canons 5 and 9 of the American Bar Association Code of Professional Responsibility ("the Code"), to disqualify the Manhattan law firm of Le-Boeuf, Lamb, Leiby & MacRae ("Le-Boeuf") from further representation in this action of plaintiffs Hartford Accident and Indemnity Company and Hartford Fire Insurance Company (collectively "The Hartford"). Plaintiffs cross move to disqualify the Manhattan law firms of Brown & Wood and Davis, Polk & Wardwell from further representation of defendants RJR Nabisco and F. Ross Johnson, respectively.

Motions such as these revolve around often subtle ethical principles and distinctions. As a result, when addressing questions of legal ethics, a court "cannot paint with broad strokes. The lines are fine and must be so marked." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir.1977) (citation omitted). At the outset, the Court notes that it recognizes, as has the Court of Appeals on another occasion, that "in deciding questions of professional ethics men [and women] of good will often differ in their conclusions." *Id.* At the heart of the present motions lies the Court's responsibility to ensure that a lawyer's duty of trust and loyalty to his client is never compromised. After careful consideration of all relevant factors, the Court concludes that LeBoeuf's duty, and RJR Nabisco's interests, have not been compromised. Accordingly, and for the reasons

set forth below, the present motions are denied in their entirety.

## I. BACKGROUND

### A. Defendant's motion:

In June of 1985, R.J. Reynolds Tobacco Company ("Reynolds Tobacco"), which is a wholly owned subsidiary of RJR Nabisco, retained Donald J. Wood, a member of the firm of Murphy & Mitchell, P.C., to represent Reynolds Tobacco in products liability litigation in the district of Massachusetts. In roughly March of 1987, Wood left Murphy & Mitchell to join the Boston office of LeBoeuf, where he was a partner until the events surrounding the present motions. When he arrived at LeBoeuf, Wood brought with him Reynolds Tobacco as a client. No one disputes that Reynolds Tobacco has a Chairman, Chief Executive Officer, corporate organization and facilities that are separate from those of its parent, RJR Nabisco.

The General Counsel and Deputy General Counsel of RJR Nabisco, Harold Henderson and George D. Newton, Jr., respectively, supervised LeBoeuf's representation of Reynolds Tobacco in the tobacco litigation. Bradley Aff. ¶ 5.[1] Wood has had a long professional relationship with Henderson. Wood Aff. ¶ 1. The legal fees for all LeBoeuf's work, however, were paid by Reynolds Tobacco, and all such legal work was performed for the tobacco company. Wood Aff. ¶ 1; Briggs Supp.Aff. ¶ 2.[2]

The Reynolds Tobacco matters have been handled exclusively by attorneys in LeBoeuf's Boston office. None of those attorneys has assisted the firm in its representation of The Hartford in the present action. Furthermore, no attorney now representing The Hartford has ever worked on any matter involving Reynolds Tobacco. Briggs Aff. ¶ 9.

On November 14, 1988, LeBoeuf was retained by its long-time client, The Hartford, to explore the possibilities of filing the present action. The firm knew then that Wood represented Reynolds Tobacco in product liability suits. Briggs Aff. ¶¶ 4–5. On November 15, the firm decided to file the present action. *Id.* Sometime shortly before the present suit was filed, the firm's managing partner in New York, Taylor R. Briggs, called LeBoeuf's managing partner in Boston, Paul K. Connolly, Jr. Briggs explained LeBoeuf's intention to sue RJR Nabisco. Briggs then told Connolly not to inform Wood of the firm's intention. Connolly told Briggs that it was Wood who should decide whether or not to bring suit against RJR Nabisco, because Reynolds Tobacco was Wood's client. Wood Aff. ¶ 6.[3]

---

**1.** *See* Newton Aff. ¶ 5 ("The General Counsel and Deputy General Counsel of RJR are responsible for supervising the tobacco litigation and LeBoeuf's representation of Reynolds Tobacco in that litigation.")

**2.** Defendant also claims, in an affidavit by RJR Nabisco's Deputy General Counsel Newton, that Wood was once retained by RJR Nabisco in connection with a legal assessment of a Massachusetts legislative action. Plaintiffs dispute this assertion and maintain that "RJR Nabisco has refused to provide The Hartford with the opportunity to cross-examine [Newton] ... and it is contradicted by LeBoeuf's records." P.Mem. at 2. However, plaintiffs never sought the Court's assistance to obtain Newton's deposition. In any event, Newton's affidavit provides scant support for the defendant's position. It merely recites that "[l]ater in 1987, Wood was also retained by [Samuel B. Witt III, then Assistant General Counsel of RJR Nabisco] to legally assess a particular Massachusetts legislative action." Newton Aff. ¶ 4. RJR Nabisco provides no additional particulars, nor has it submitted an affidavit from Witt. Moreover, Wood's own affidavit undermines RJR Nabisco's contention by omitting any reference to such representation: "When I joined LeBoeuf ... *because ... the legal work which was being performed by the firm was for the tobacco company,* the tobacco company was the named client ..." Wood Aff. ¶ 1 (emphasis added).

**3.** Although reluctant to accept the hearsay allegations contained in the Wood affidavit, the Court notes that Briggs submitted a Supplemental Affidavit, in which he challenged, in detail, several assertions made in the Wood affidavit. Certain conversations Wood recalled having had with Briggs, for instance, Briggs contends never occurred. *See, e.g.,* Briggs Supp.Aff. ¶¶ 8–9. Conspicuously absent, however, from Briggs' second affidavit is any contention that he never had the conversations with Connolly described by Wood. Presumably, had the Briggs–Connolly conversations never occurred, Briggs would have corrected the record before this Court.

On the morning of November 16, Briggs telephoned Wood to inform him of the firm's decision to represent The Hartford in its suit against RJR Nabisco. Wood strongly objected to the suit, which he felt raised an unavoidable conflict of interest. He told Briggs that he considered RJR Nabisco as well as Reynolds Tobacco to be the firm's client. Briggs Aff. ¶ 6; Wood Aff. ¶ 4.[4] Wood then telephoned Newton, RJR Nabisco's Deputy General Counsel, who indicated, at least in a preliminary manner, that RJR Nabisco would not consent to waive the conflict he and Wood felt was raised by the imminent suit. Wood Aff. ¶ 5. Later that day, LeBoeuf filed the present action, which challenged the recent leveraged buy-out ("LBO") of RJR Nabisco by the investment firm of Kohlberg Kravis & Roberts. In general, plaintiffs alleged that the LBO violated federal securities and common law prohibitions against fraud.

On November 18, Wood sent a letter to Newton at RJR Nabisco. "Upon learning of the intent to file [the present suit,]" Wood wrote, "I strongly objected to it."

> I have a long-standing relationship with Reynolds and I want to continue it. As I indicated to you, I am prepared to do what is necessary to continue that relationship. I also realized that R.J. Reynolds has to do whatever is necessary to protect its interest. I also recognize my duty of loyalty to Reynolds as a client. You can be assured that I will be fully cooperative with Reynolds regarding any aspect of our relationship or matters resulting from ... this problem.

D.Exh. A.

Although the parties disagree somewhat on precisely what happened over the course of the next few months, it is fair to say that Wood's relationship with LeBoeuf became strained. According to Wood, on January 9, 1989, Connolly told him that the firm's administrative committee was scheduled to meet the next day in New York. Connolly advised Wood that one of the items on the scheduled agenda was "the

future of Donald Wood." On January 11, Connolly told Wood that the firm had, the previous day, decided to terminate Wood as a partner. Connolly explained to Wood that the termination resulted from the firm's decision to downgrade its Boston office, given its conclusion that the office's litigation business did not support a litigation department. Wood Aff. ¶ 9. In early May, Connolly told Wood that the firm wanted Wood out by June 1, 1989. On May 18, Wood's partnership status was terminated. Wood Aff. ¶ 10.

According to Briggs, the firm had become dissatisfied with Wood's performance before the emergence of the conflict issue and the commencement of the present action. The firm permitted Wood latitude in structuring his departure.

> For reasons that were not clear at the time, he elected to delay his departure to mid-May. At that point, he insisted that his relationship with the firm end immediately (on May 18) and that his departure be described as a "termination." It now seems apparent that he has strategically planned his departure so that he could swear to an affidavit (as a former partner) on May 19 in support of RJR Nabisco's motion, in which he could state that he had been "terminated by the firm."

Briggs Supp.Aff. ¶ 7.

Whether LeBoeuf was dissatisfied with Wood's performance prior to November of 1988 is beside the point. Even Briggs implicitly accepts the obvious: after the November 16 filing of this action, and after Wood's November 18 letter to RJR Nabisco's Deputy General Counsel, the partnership between Wood and LeBoeuf continued in name only. No one disputes that, since leaving LeBoeuf in May, Wood has maintained a close relationship with Reynolds Tobacco and RJR Nabisco.

### B. Plaintiff's motion:

According to plaintiffs, John Zuccotti, a partner at Brown & Wood, represents The Hartford's parent, ITT Corporation ("ITT")

---

**4.** Briggs has no recollection of being told by Wood that the latter considered RJR Nabisco, as well as its tobacco subsidiary, the firm's client. Briggs Supp.Aff. ¶ 9.

and an ITT subsidiary, the Sheraton Corporation. Davis, Polk & Wardwell similarly has represented ITT, most recently in a shareholder derivative suit against ITT's senior officers. Based on defendants' affidavits, it is clear that their representation of ITT and any ITT subsidiary had ended before the commencement of the present action.

Although Brown & Wood, counsel to RJR Nabisco, opposes plaintiff's motion, nonetheless, "in order to alleviate the burden of the Court, Brown & Wood has offered to withdraw as counsel for RJR [Nabisco] if LeBoeuf will withdraw from representation of Hartford." D. Reply at 2. Given the Court's decision today, Brown & Wood's selfless gesture need not be acted upon.

## II.  DISCUSSION

■ Canon 5 of the Code provides that "[a] lawyer should exercise independent judgment on behalf of a client" and generally forbids an attorney from representing a person with interests differing or adverse to those of an existing client.[5]  Canon 9 provides that a lawyer "should avoid even the appearance of professional impropriety."  Even defendants recognize that courts are reluctant to rest disqualification of counsel solely upon Canon 9.  *See e.g.,* *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 757 (2d Cir.1975); *Huntington v. Great Western Resources, Inc.,* 655 F.Supp. 565 (S.D.N.Y. 1987)  Instead, courts generally require proof that another Canon has been violat-

---

5. Disciplinary Rule 5–105 provides:
   (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would involve him in representing differing interests, except to the extent permitted under DR 5–105(C).
   (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

ed.  *See Silver Chrysler Plymouth,* 518 F.2d at 757.  Thus, this Court turns its attention to Canon 5.

■ The Second Circuit has established alternative guidelines for a district court to follow on a disqualification motion, depending on the particular facts of the case.  If a firm represents a client in the traditional sense, and if that relationship is a continuing one, then a strict rule governs that firm's ability to represent another client in a suit against the original client.  This strict burden "is properly imposed when a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense."  *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir.1981).  In such a direct representation case,

> the lawyer who would sue his own client, asserting in justification the lack of "substantial relationship" between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed.  Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned. . . .  Where the relationship is a continuing one, adverse representation is prima facie improper . . . and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* [emphasis in original] conflict in loyalties or diminution in the vigor of his representation.

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

*Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir.1976) (citation omitted).[6] Thus, if RJR Nabisco, through its subsidiary Reynolds Tobacco, not only was a LeBoeuf client in the traditional sense, but also enjoys a continuing relationship with the firm, then LeBoeuf's current representation of The Hartford in its suit against RJR Nabisco would be prima facie improper.

The Second Circuit, however, has established a less stringent standard for cases of vicarious or attenuated representation, or where the potentially improper relationship is not a continuing one.

> [W]hen an adverse party is only a vicarious client by virtue of membership in an association [for instance], the risks against which Canon 5 guards will not inevitably arise.... Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents [—as in this instance—] an association as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant.

*Glueck*, 653 F.2d at 749. Although "[w]here the relationship is a continuing one, adverse representation is prima facie improper," *Cinema 5*, 528 F.2d at 1387, where the alleged conflict relates to a former client, disqualification is warranted only where there is a substantial relationship between the subject matters of the representation. *See, e.g., International Electronics Corp. v. Flanzer*, 527 F.2d 1288 (2d Cir.1975); *Emle Industries, Inc. v. Patentex, Inc*, 478 F.2d 562 (2d Cir.1973).

The Second Circuit has developed this more lenient—if still important—standard because it "recogniz[es] the serious impact of attorney disqualification on the client's right to select counsel of his choice, [and

has thus] indicated that such relief should ordinarily be granted only when a violation of the canons of the Code ... poses a significant risk of trial taint." *Glueck*, 653 F.2d at 748 (citation omitted). As Judge Feinberg has explained,

> [D]isqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code ... undermines the court's confidence in the vigor of the attorney's representation of his client, ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation ... thus giving his present client an unfair advantage.... But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct ... This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons ... [W]e believe that unless an attorney's conduct tends to "taint the underlying trial" ... by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney.

*Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979) (citations and footnotes omitted).

This Court, then, must answer two questions: first, was RJR Nabisco, through its subsidiary Reynolds Tobacco, a client of LeBoeuf? And, if so, should that relationship be considered a continuing one, as it was when the present suit was first filed last November? The answer to the first

---

**6.** In *Cinema 5*, for instance, plaintiff's counsel, a partner in a Manhattan firm, was also a partner in a Buffalo firm that represented defendant Cinerama, Inc. "in other litigation of a somewhat similar nature." *Id.* at 1385. The court concluded that plaintiff

> failed to meet [its] heavy burden and that, so long as [plaintiff's counsel] and his Buffalo partners continue to represent Cinerama, he

and his new York City partners should not represent Cinema 5, Ltd. ... It can hardly be disputed that there is at least the appearance of impropriety where half his time is spent with partners who are defending Cinerama in multi-million dollar litigation, while the other half is spent with partners who are suing Cinerama in a lawsuit of equal substance. *Id.* at 1386–87 (footnote and citations omitted).

**540**

question is yes. The answer to the second question is no.

■ Although the matter is not wholly free from doubt, the Court concludes that RJR Nabisco, through its subsidiary Reynolds Tobacco, was a client of LeBoeuf. Certain aspects of their separate corporate identities notwithstanding, the parent attached considerable importance to the product liability litigation against its subsidiary and, accordingly, supervised the subsidiary's litigation. *See, e.g.,* Wood Aff. ¶ 2 ("I have, for the most part, received assignments requesting legal representation from an officer or attorney of RJR Nabisco even though the services were to be performed for [Reynolds Tobacco].") The Office of the General Counsel at RJR Nabisco thus had the right to steer the products liability litigation as it saw fit, and did so. If the parent and subsidiary were in fact distinct and separate entities for representation purposes, then there would have been no need for the parent's general counsel to have retained this supervisory role. Indeed, Wood originally came to Reynolds Tobacco through his relationship with a senior member of that general counsel's office.

■ The second question—whether the attorney-client relationship is a continuing one—is more difficult than the first. Because LeBoeuf's representation of Reynolds Tobacco has been terminated, plaintiff asks the Court to employ the "substantial relationship" test. RJR Nabisco contends that the "substantial relationship" test is inappropriate, because Reynolds Tobacco was an existing client of LeBoeuf when the present action was filed. If the rule were otherwise, defendant argues, then the challenged attorney could improperly eliminate the conflict by turning an existing client into a former client by "firing" the disfavored client. For this proposition, defendant relies on two cases, which, in the words of one, explain that "[i]f this were not the case, the challenged attorney could always convert a present client into a 'former client' by choosing when to represent the disfavored client." *Unified Sewerage Agency, etc. v. Jelco Inc.,* 646 F.2d 1339,

1345 n. 4 (9th Cir.1981); *see also Fund of Funds v. Arthur Andersen & Co.,* 435 F.Supp. 84, 95 (S.D.N.Y.), *aff'd in part, rev'd in part,* 567 F.2d 225 (2d Cir.1977).

Defendant's position has a superficial appeal, but, in the circumstances of this case, is unpersuasive. There is an important distinction between what the courts sought to protect and prevent in *Fund of Funds* and *Unified Sewerage* and what this Court now faces. In those cases, the law firms sought to insulate themselves from a disqualification motion by, in effect, "firing" the no longer desirable client. Clearly, no court should condone such conduct; it smacks of disloyalty where loyalty is owed, and notwithstanding the apparent elimination of the conflict, there remains the possibility that former client confidences will be abused. Apart from actual prejudice—and there would be a substantial risk of that—such an action creates at least the *appearance* of prejudice and obvious impropriety. Equally important, the rule articulated in these earlier cases serves to protect the disfavored client from being cut adrift, without the benefit of prior counsel, or the guarantee that substitute counsel would be available. The ABA designed its ethical canons to guard against precisely such dangers. *Cf. Glueck,* 653 F.2d at 748 (courts should protect a client's right to select counsel of his choice).

The *Fund of Funds* rule remains client-oriented, and focuses on practical problems of access by the attorney to the client's confidential communications, and access by the client to legal representation. It thus ensures that a prior client will not be cut loose from its legal counsel simply because a more lucrative client comes along with a claim against it. It also ensures that confidences will be honored.

In this case, however, the Court is confronted with something different. LeBoeuf did not "fire" Reynolds Tobacco as a client and keep Wood, the repository of Reynolds Tobacco's confidences, which could then be used against it. There is no indication that any LeBoeuf partner other than Wood worked on Reynolds Tobacco matters. There is no indication that any-

one at LeBoeuf other than Wood obtained confidential information about Reynolds Tobacco, much less RJR Nabisco, the defendant in this suit. Moreover, there is no indication that Wood held client confidences relevant to the present suit. The present suit has been handled, from its inception, by LeBoeuf's New York office. Wood, in the Boston office, was not even told of the suit until the eve of filing. At the argument of this motion, counsel for RJR Nabisco candidly admitted that he was aware of no actual prejudice to RJR Nabisco if LeBoeuf remained counsel for The Hartford.[7]

Unlike the potential prejudice to the disfavored client in *Unified Sewerage* and *Fund of Funds*, there is also no indication that Reynolds Tobacco has been separated from its longtime counsel, Donald Wood. In Wood's own words, he "[has had] a longstanding relationship with Reynolds [Tobacco] and I want to continue it." D. Exh. A. That relationship both predated Wood's association with LeBoeuf and continues today, months after his partnership was terminated. Thus, the Court is not faced with a client abandoned by its counsel, or by counsel who will represent their clients with anything less than full vigor. Nor is there any concern here that privileged information will be misused. Under such circumstances, it seems to this Court that only a wooden application of the ABA canons would support disqualification. In this day of frequent firm reorganizations and lateral transfers, such an application would merely invite an increased number of disqualification motions, born of little more than hardball litigation strategy sessions and advanced where there is no threat of actual prejudice.

The ill the *Fund of Funds* rule is designed to correct is not simply the appear-ance of a law firm suing a former client on behalf of a new client. It resides in the practical threats to the former client. Here such threats do not exist. So long as there is no showing of a substantial similarity between the matters being litigated and those handled in the past for the former client, so long as there is no showing of even the potential for actual prejudice against the former client, and so long as the former client retains access to its prior counsel—precisely the situation here—then there is no reason to disqualify any counsel.[8]

Plaintiff's cross motion is prospective in nature. As Edwin Kilburn, the Vice President and Associate General Counsel of ITT, explains, "[plaintiff moves to disqualify defendants' law firms] in the event that this Court enunciates a standard disqualifying [LeBoeuf]." Kilburn Aff. ¶ 2. Moreover, "ITT has not previously viewed these representations as conflicting with those assumed by Brown & Wood and Davis, Polk and Wardwell in this action." *Id.* ¶ 3. Apparently, ITT's opinion has not changed; the Kilburn affidavit cites no claim by ITT that it now sees any conflict. Nor has plaintiff produced any reliable evidence that ITT's relationship with these firms is continuing, and not merely "historic," a term employed by counsel at argument. Considering all these factors, as well as the lack of any similarity between the past and current matters being litigated, the Court concludes that the law firms of Brown & Wood and Davis, Polk & Wardwell, need not be disqualified from further representation of their clients in this action.

## III. CONCLUSION

After a careful review of the facts of this case, the Court finds it unnecessary to disqualify any firm from further representa-

---

7. Moreover, disqualification motions are particularly fact specific, and on the record before it, the Court concludes that the "parameters of [LeBoeuf's relationship with Reynolds Tobacco] [had] been fixed," *Cinema 5,* 528 F.2d at 1387, before the commencement of this action, much as they would have been had the attorney-client relationship been terminated before, and not after, the suit was filed.

8. Given the disposition of the present motions, the Court need not consider plaintiff's remaining arguments. It does note, however, that plaintiff's contention that RJR Nabisco waived its curren objections is without merit. RJR Nabisco raised the issue at the outset of the current litigation, and filed the present motion, with the Court's permission, in a timely fashion.

tion of the parties to this action. Unlike the *Cinema 5* matter, the Court has not been presented with a case of active representation of two parties before it. Furthermore, and again unlike *Cinema 5*, the litigation matters presented here are not of a "somewhat similar nature" to those litigated elsewhere and in the past. *Cinema 5*, 528 F.2d at 1385. Finally, the relationships between the firms and clients before this Court are not continuing.

Accordingly, the present motions are denied in their entirety.

SO ORDERED.