**Margaret A. Naughton MARSHALL, Plaintiff,**

v.

**STATE OF NEW YORK DIVISION OF STATE POLICE, James P. McMahon, in his official capacity as Superintendent of the New York State Division of State Police, David M. Luitweiler, in his official capacity as former First Deputy Superintendent of the New York State Division of State Police, Francis A. Defrancesco, in his official capacity as Chief Inspector of the New York State Division of State Police, and Thomas A. Constantine, in his official capacity as former Superintendent of the New York State Division of State Police, Defendants.**

No. 95–CV–806.

United States District Court, N.D. New York.

Jan. 15, 1997.

Ruberti, Girvin & Ferlazzo (E. Michael Ruberti, of counsel), Albany, NY, for Plaintiff.

Attorney General of the State of New York (David B. Roberts, of counsel), Albany, NY, for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

The case that underlies the present dispute involves allegations of sexual harassment. However, the issue presently before the Court has little to do with sexual harassment. Instead, the present dispute revolves around the lives of lawyers and their potential for conflicts of interest. On this point, few facts are uncontested. Consequently, the Court has had to sift through the parties' submissions in an effort to lay this factual predicate for the instant dispute.

In July of 1993, attorney Mary Helen Moses of Ruberti, Girvin & Ferlazzo ("Ruberti Firm") forwarded a document to the Governor's Office of Employee Relations ("Governor's Office"); the 23–page document ("Moses Document") contained allegations of sex discrimination involving approximately 12 female employees, including Plaintiff, at the New York State Division of State Police ("NYSP"). The document was submitted to Joseph Bress, former Director of the Governor's Office of Employee Relations. Bress shared the document with Richard Girgenti, Director of Criminal Justice, and Thomas Constantine, Superintendent of State Police.

As a result of these allegations, Superintendent Constantine ordered an investigation. The purpose of this investigation, however, is the subject of profound disagreement between the parties. According to Defendants, the investigation was begun in an effort to effectively evaluate the allegations in the Moses Document and defend against any possible litigation. According to Plaintiff, the purpose of the investigation "was to settle the claims of Plaintiff and the other female members of the NYSP, not as Defendants' suggest, to prepare a litigation

defense." (Pltf's Mem. of Law in Opposition at 5.)

In any event, at some point after the investigation commenced, Mr. Bress informed Superintendent Constantine that due to his agency's lack of legal expertise in this field, Ms. Kim Greene, Esq. would be assisting him in his review and analysis of the investigation. At the time, Greene was the Director of the Governor's Task Force on Sexual Harassment. In early January, 1994, Ms. Greene resigned her position as Director of the Task Force and Deputy Counsel at the New York State Department of Labor. And, as a result of concerns raised by State Police Counsel Glenn Valle regarding confidentiality, Ms. Greene was placed on the payroll as an hourly employee of the Governor's Office of Employee Relations.

Towards the conclusion of the NYSP investigation, Superintendent Constantine invited Mr. Bress, Mr. Girgenti, Mary Anne Crotty (Director of Policy Management for Governor Cuomo), Maureen Casey, Esq. (Counsel to Mr. Girgenti), and Ms. Greene to attend a day-long briefing on the results of the NYSP investigation. This briefing took place at the State Police Academy on February 23, 1994, and Ms. Greene was in attendance.

Shortly after the briefing, Mr. Bress gave Ms. Greene the first volume of the two volume State Police investigation report. Ms. Greene issued a 30 page written analysis of the investigation dated October 17, 1994. This analysis prepared by Ms. Greene was marked "Confidential."

In March of 1995, selected portions of Ms. Greene's analysis were quoted in various newspapers. These newspapers claimed to have obtained copies of Greene's confidential report from an unidentified and anonymous source. A newspaper reporter subsequently provided a copy of the confidential report to the Ruberti Firm. The NYSP learned that the Ruberti Firm was in possession of a copy of the report during a settlement meeting on May 23, 1995.

In late June, 1995, Ms. Greene began working for Plaintiff's counsel, Ruberti, Girvin & Ferlazzo. In March 1996, Assistant Attorney General David Roberts notified the Ruberti Firm that because of Greene's prior involvement in this case, the State had conflict-of-interest concerns about her affiliation with the Ruberti Firm. On May 7, 1996, Defendants served the instant Motion to Disqualify. On May 15, 1996, Ms. Greene left Ruberti, Girvin & Ferlazzo. On June 21, 1996, Plaintiff served a Cross–Motion for Rule 11 Sanctions on the basis that Defendants' present motion is not supportable.

Currently before the Court are Defendants' Motion to Disqualify the law firm of Ruberti, Girvin & Ferlazzo and Plaintiff's Cross–Motion for Rule 11 Sanctions.

## II. DISCUSSION

In this Circuit it is well settled that a motion to disqualify is committed to the discretion of the district court. *See, e.g., Cheng v. GAF Corp.,* 631 F.2d 1052, 1055 (2d Cir.1980), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975). In addition, motions to disqualify are generally viewed with disfavor in this Circuit. *See, e.g., Huntington v. Great Western Resources, Inc.,* 655 F.Supp. 565, 571 (S.D.N.Y.1987) ("The Second Circuit has emphasized in its most recent disqualification opinions that a court's ultimate objective in weighing disqualification questions is to ensure that the balance of presentations in a litigation will not be tainted by improper disclosures.... Courts have been directed to take a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'") (citations omitted). A party seeking disqualification must meet a high standard of proof before disqualification will be granted. *See Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983).

That said, however, the American Bar Association Code of Professional Responsibility ("Code") has been recognized as providing appropriate guidelines for determining proper professional behavior. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 n. 2 (2d Cir.1977); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 129 n. 2 (2d Cir.1976); *cf. Armstrong v. McAlpin,* 625 F.2d 433, 446 n. 26 (2d Cir.1980), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct.

911, 66 L.Ed.2d 835 (1981) (although ABA committee that drafted Code has indicated rules were intended for use in disciplinary proceedings rather than in disqualification proceedings, court can refer to Code for guidance).

The Code of Professional Responsibility is clear that an attorney must preserve the confidences and secrets of a client. Canon 4 and its Ethical Considerations and Disciplinary Rules provide the standards to guide an attorney in preserving the confidences and secrets of a client:

Except when permitted by DR 4–101(C), a lawyer shall not knowingly:

1. Reveal a confidence or secret of a client.

2. Use a confidence or secret of a client to the disadvantage of the client.

3. Use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

N.Y.Jud.Law § DR 4–101(B) (McKinney 1992). The Code of Professional Responsibility further provides that attorneys should avoid conflict of interests with former clients:

Except with the consent of a former client after full disclosure a lawyer who has represented the former client in a matter shall not:

1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

2. Use any confidences or secrets of the former client except as permitted by DR 4–101(C) or when the confidence or secret has become generally known.

N.Y.Jud.Law § DR 5–108(A) (McKinney 1992).

The Second Circuit has held that in order to ensure adherence to these principles, an attorney may be disqualified from representing a client if,

(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans,* 715 F.2d at 791 (2d Cir.1983) (citations omitted); *see also United States v. DiTommaso,* 817 F.2d 201 (2d Cir.1987). However,

'there is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel—a right which must be balanced against the need to maintain the highest standards of the profession.'

*Evans,* 715 F.2d at 791 (*quoting Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978)).

### A. Former Client Relationship

On the issue of Greene's relationship with the NYSP, Plaintiff argues that Greene was employed by the Governor's Office of Employee Relations and thus was not in an attorney-client relationship with the New York State Police. Plaintiff avers that the NYSP was neither involved in Greene's selection and hiring, nor was the NYSP in control of her work product. (Greene Aff. ¶¶ 4–11). In addition, Plaintiff argues that each and every aspect of Greene's employment was directed and defined by the Governor's office. (Greene Aff. ¶¶ 4–11). Furthermore, Plaintiff argues that Greene was never hired to provide legal services, counseling, guidance, or advice to the NYSP. (Greene Aff. ¶¶ 4–11). Likewise, Plaintiff asserts that Greene's role was limited to that of reviewing the adequacy of the NYSP investigation and its proposed remedial measures, not to provide advice on litigation strategy.

In response, Defendants acknowledge that "[n]obody claims that Kim Greene was acting as counsel for the Division of State Police, in the usual sense of an attorney-client relationship." (Defs's Mem. of Law at 2). However, Defendants state that Greene's role, although

not officially that of counsel to the NYSP, was akin to such a position, in that the confidential internal State Police investigation was provided to her to allow her to evaluate its merits and to render legal advice to several top State officials, including State Police Superintendent Constantine, and ultimately the Governor. (Bress Aff. ¶¶ 4–6, 10, 14).

■ In analyzing this issue, it is clear the Court is not bound by Ms. Greene's personal conclusion as to whether she perceived that an attorney-client relationship existed. Moreover, as the Second Circuit has noted, "the issue [in a disqualification case] is not whether [counsel's] relationship to [the moving party] is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict involved in [counsel's] role as plaintiff's counsel in this action.' " *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir.1981) (citations omitted); *see also Westinghouse Electric Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1318–20 (7th Cir.) ("There are several fairly common situations where there is no express attorney-client relationship, there exists nonetheless a fiduciary obligation or an implied professional relation."), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).

Indeed, a number of Court's have held that the requirements of confidentiality and the necessary limitations on subsequent representation apply even though the adverse interests are not those of a client in the traditional sense. For example, disqualification has been ordered where the prior client is not even a party in the present litigation, but whose interest will nevertheless be affected by the suit. *See In re Maritima Aragua,* 847 F.Supp. 1177, 1182 (S.D.N.Y.1994) (*citing Don King Prods., Inc. v. Harlow,* 1988 WL 112896 (S.D.N.Y.1988)); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 234 (2d Cir.1977) (ordering disqualification although the firm never represented the client because of the firm's involvement with a second firm that is disqualified for representing interests adverse to the client). In addition, disqualification has been ordered where

the adverse party, although never a client, was related to a previously represented client. *See Emle Indust., Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973) (affirming disqualification of plaintiffs' attorney who had previously represented part owner of corporate defendant in case involving identical issue); *Hartford Accident and Indemnity Co. v. RJR Nabisco, Inc.,* 721 F.Supp. 534, 539–540 (S.D.N.Y.1989) (finding on a motion to disqualify that plaintiff's law firm who represented defendant corporation's subsidiary in prior representation would be deemed to have previously represented the defendant parent corporation); *State Farm Mut. Auto. Ins. Co. v. Walker,* 382 F.2d 548 (7th Cir. 1967) (law firm obtaining admission from insured in the course of representing insurer against third-party claim should withdraw from further representation in lawsuit between insurer and insured), *cert. denied,* 389 U.S. 1045, 88 S.Ct. 789, 19 L.Ed.2d 837 (1968); *see generally Westinghouse Elec.,* 580 F.2d at 1318–20 (discussing ethical obligations of a law firm in the absence of "express attorney-client relationship").

■ Based on this body of case law, the Court will not adopt Plaintiff's constrained view of what constitutes an attorney-client relationship such that disqualification under *Evans* might be appropriate. As stated above, whether Greene's relationship with the NYSP rose to the level of "attorney-client" is not the ultimate issue. Instead, the Court must ascertain "whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict involved in [counsel's] role as plaintiff's counsel in this action.' " *Glueck,* 653 F.2d at 748–49.

Here, the Court cannot conclude that the NYSP and the GOER would have revealed their "confidences," at a time when the State clearly knew that litigation was possible, if not imminent, without some expectation that Greene owed a duty of confidentiality. Moreover, Greene sat in on a full-day confidential meeting at which the results of the State Police internal investigation were presented to executive staff at the top levels of State government. In addition, Greene was provided a copy of the confidential internal

investigative report prepared by the Division of State Police in response to the allegations contained in the document forwarded by Attorney Moses. Greene even prepared a confidential report that evaluated and critiqued the NYSP's evidence.

To argue now that her role was simply that of "liaison" is simply not credible. Neither is it believable that the NYSP investigation and Ms. Greene's report were created without any regard to future litigation. Even if the Court were to accept as true that the NYSP never intended to litigate this case, common sense dictates that the NYSP investigation and Ms. Greene's critique were integral parts of any settlement strategy in that they provided the NYSP with some indication of its chance of success *at trial* and thus its bargaining position at settlement.

Accordingly, the Court finds that "there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict involved in [counsel's] role as plaintiff's counsel in this action.'" *Glueck,* 653 F.2d at 748–49. Thus, the first prong of the *Evans* test has been met.

### B. Substantial Relationship

■ In defining the "substantial relationship" test, the Second Circuit has set forth a clear standard. Disqualification should be granted "upon a showing that the relationship between the issues in the prior and present cases is 'patently clear' [or] when the issues involved have been 'identical' or 'essentially the same.'" *Government of India,* 569 F.2d at 739–40 (*citing Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 754–56 (2d Cir.1975); *NCK Organization,* 542 F.2d at 135–36 (concurring opinion); *Hull,* 513 F.2d at 571; *Emle Indust.,* 478 F.2d at 572; *Motor Mart, Inc. v. Saab Motors, Inc.,* 359 F.Supp. 156, 158 (S.D.N.Y.1973)).

■ There is little doubt that the NYSP investigation and the current action are essentially the same. The case at bar involves similar issues and similar claims. In fact, plaintiff Margaret Naughton Marshall was one of the twelve female employees alleging sex discrimination in the 23–page Moses Document forwarded by the Ruberti Firm to the Governor's Office.

In addition, although Greene may not have been expressly hired to provide advice in preparation for litigation, the NYSP investigation and Ms. Greene's report were integral parts of the State's litigation strategy in that they provided the NYSP with some indication of its chance of success at trial.

Thus, the subject matter of Ms. Greene's work is substantially similar to the case at bar and the second prong of the *Evans* test has also been met.

### C. Privileged Information

■ The final prong of the *Evans* test involves a determination of whether or not the attorney involved in the prior case had access to confidences or other privileged information. "Except when permitted by DR 4–101(C), a lawyer shall not knowingly ... [r]eveal a confidence or secret of a client [or use] a confidence or secret of a client to the disadvantage of the client." N.Y.Jud.Law § DR 4–101(B) (McKinney 1992)); *Fund of Funds,* 567 F.2d at 236. "Moreover, the court need not, indeed cannot, inquire whether the lawyer did, in fact, receive confidential information during his previous employment, [but] where 'it can reasonably be said that in the course of the former representation the attorney might have acquired the information related to the subject matter of his subsequent representation,' it is the court's duty to order the attorney disqualified." *Emle Indus., Inc.,* 478 F.2d at 571 (emphasis removed) (*quoting T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953)).

■ At this point, it should be apparent that Greene had access to privileged information during her tenure with the State. Indeed, volume one of the State Police investigation report that Greene was given contained approximately 300 pages of confidential information. In addition to being provided a copy of the internal investigative report prepared by the Division of State Police, Greene sat in on a full-day confidential meeting at which the results of the State

Police internal investigation were presented and discussed by executive staff at the top levels of State government.

Thus, the final prong of the *Evans* test has been met.

### D. The Ruberti Law Firm

Consequently, the only remaining issue is whether the law firm of Ruberti, Girvin & Ferlazzo must be disqualified due to its association with Kim Greene. Disciplinary Rule 5–105(D) provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." DR 5–105(D).[1]

■ Moreover, Disciplinary Rule 5–105(D) constitutes a presumption that client confidences are communicated among the attorneys within a law firm. This presumption may be rebutted when appropriate and effective screening measures are instituted to prevent the dissemination of confidences by a disqualified attorney. *See Manning v. Waring, Cox, James, Sklar and Allen*, 849 F.2d 222, 224–26 (6th Cir.1988); *Schiessle v. Stephens*, 717 F.2d 417, 421 (7th Cir.1983); *LaSalle Nat'l Bank v. Lake County*, 703 F.2d 252, 257–59 (7th Cir.1983); *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1086–87 (S.D.N.Y.1989); *Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 572 (S.D.N.Y.1987); *Yaretsky v. Blum*, 525 F.Supp. 24, 29–30 (S.D.N.Y.1981).

The Court is not incognizant of the fact that this imputation of conflict may create burdens for both lawyers and their clients. As the drafters of the Restatement (Third) of the Law Governing Lawyers noted:

> Imputation means that a client who wishes to be represented by a trusted or highly recommended lawyer may not retain that lawyer as counsel. Imputation may prohibit literally hundreds of lawyers in several cities from acting even though only one

of their number is personally prohibited from acting. Concern about prospective imputed prohibition may inhibit mobility of lawyers from one firm or employer to another. It therefore is important that imputation not inappropriately inhibit the mobility of lawyers. The burden of prohibition should end when material risks to confidentiality and loyalty resulting from shared income and access to information have been avoided by appropriate measures.

American Law Institute Restatement (Third) of the Law Governing Lawyers § 204, Comment (b), Tentative Draft No. 4 (April 10, 1991). In fact, the Court of Appeals for the Second Circuit has observed that "[a]nticipating difficulties caused by a strict application of Disciplinary Rule 5–105(D), law firms have employed various methods of screening a possibly tainted attorney from the rest of the firm's involvement in a particular case." *Cheng*, 631 F.2d at 1057.

This is not to say that in every instance a law firm can avoid disqualification simply by adopting screening methods. In *Trustco Bank New York v. Melino*, 164 Misc.2d 999, 625 N.Y.S.2d 803 (Sup.Ct., Albany Co. 1995), Justice Harris wrote:

> In order for the traditional rule of *per se* disqualification to be converted from an irrebuttable presumption to a rebuttable one there must be a confluence of three factors: (1) That the involvement of the 'tainted' attorney or law firm in the prior representation giving rise to the conflict must have been minuscule; (2) that the 'tainted' attorney is no longer connected with the law firm seeking to avoid disqualification; and (3) that the configuration of the law firm seeking to avoid disqualification, and the nature of its work, is such that its attorneys are not so intimately acquainted with all the work in the office that they could be expected to share client confidences and ideas about how to handle

---

1. DR 5–105(D) provides:
   While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under DR 5–101(A), DR 5–105(A), (B), or (C),

DR 5–108 [Conflict of Interest—Former Client], or DR 9–101(B) except as otherwise provided therein.
Lawyer's Code of Professional Responsibility DR 5–105(D) (1990).

client problems as a matter of course, but large enough and so segregated into departments that it would be reasonable to assume that the attorneys of the firm as a whole would not necessarily become aware of every client of the firm and share in all of the client confidences and secrets which the firm, as a whole, possessed.

*Trustco Bank New York,* 625 N.Y.S.2d at 806–07 (*citing Solow v. W.R. Grace & Co.,* 83 N.Y.2d 303, 632 N.E.2d 437, 610 N.Y.S.2d 128 (1994)).

■ Moreover, while screening devices may be used in some circumstances to prevent the disclosure of confidences and secrets from a prior representation, thus allowing a law firm to avoid disqualification, they cannot be used where the circumstances are such that a court cannot determine that they will effectively prevent disclosure. For example, in *Cheng v. GAF Corp.,* 631 F.2d 1052 (2d Cir.1980), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981),[2] the Second Circuit reversed the District Court's failure to disqualify a law firm. The disqualified attorney was a member of a firm of thirty-five attorneys, approximately twenty-one of whom worked in his office. *Cheng,* 631 F.2d at 1054. The attorney worked in the health law division of the firm and the representation at issue was being handled by the firm's labor division. *Cheng,* 631 F.2d at 1054. The firm submitted affidavits stating that the attorney had not worked on the case, that he had not disclosed any confidences or discussed the merits of the case, and that he would not be allowed to have any substantive involvement in it. *Cheng,* 631 F.2d at 1054. Nevertheless, the Court of Appeals concluded: "Although we do not question [the disqualified lawyer's] integrity or his sincere efforts to disassociate himself from the *Cheng* case, we are not satisfied that under the facts of this case the screening will be effective, thus we look to Disciplinary Rule 5–105(D) and order the district court to disqualify [his] firm." *Cheng,* 631 F.2d at 1058 (citations omitted).

---

**2.** Although *Cheng* was subsequently vacated on jurisdictional grounds, its substantive holding was reaffirmed by the Second Circuit in *Cheng v. GAF Corp.,* 747 F.2d 97, 98 (2d Cir.1984). *See*

■ Here, although Mr. Ruberti states that Greene "was given access to a limited number of client files," (Ruberti Aff. ¶ 12), none of the affidavits submitted by Plaintiff's counsel suggest that *any formal institutional mechanisms* were in place before or after Greene's arrival at the Ruberti Firm that would have insulated her from this sexual harassment case. It appears that the only action that the Ruberti Firm took, which can be construed as a screening procedure, was to have Ms. Greene leave the firm on May, 15, 1996, almost a year after she became affiliated with the Ruberti Firm.

Moreover, given the *Cheng* court's careful scrutiny of the effectiveness of screening procedures and its finding that screening devices that are subject to doubt are inadequate, a screening device implemented only after a disqualified lawyer has been with a firm will not provide adequate protection of confidences. *See Atasi Corp. v. Seagate Technology,* 847 F.2d 826, 831 (Fed.Cir.1988) (holding that presumption of shared confidences was not overcome by screening where there was a lack of evidence that screening measures were taken at time of disqualified attorney's move to the firm); *EZ Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1462 (Fed.Cir. 1984) ("it was permissible for [the district court judge] to hold that the screening arrangement must be set up 'when the potentially disqualifying event occurred' and the new firm knows (or must have been aware) of the problem"); *LaSalle Nat'l Bank v. Lake County,* 703 F.2d 252, 259 (7th Cir. 1983) (holding that the district court did not abuse its discretion in granting disqualification, because, among other reasons, "screening arrangements were not established until the disqualification motion was filed in August 1981 [and] no specific institutional mechanisms were in place to insure that information was not shared, even if inadvertently, between the months of February and August"); *Papanicolaou,* 720 F.Supp. at 1087 ("This Court doubts whether any Chinese walls, which are meant to be preemptive, can ever function effectively when erected in re-

---

*Baird v. Hilton Hotel Corp.,* 771 F.Supp. 24, 27 n. 1 (E.D.N.Y.1991) ("it is abundantly clear that the Second Circuit considers its first *Cheng* decision to be sound").

sponse to a motion, and not prior to the arising of the conflict.") (citations omitted); *U.S. Football League v. National Football League*, 605 F.Supp. 1448, 1467 (S.D.N.Y. 1985) (disqualifying law firm, because of evidence "indicating that confidences about the USFL may well have passed within the firm before [the firm] instituted its screen").

As in *Cheng*, which involved a 35 lawyer firm, the relatively small size of the Ruberti Firm (approximately 15 lawyers) raises doubts that even the most stringent screening mechanisms could have been effective in this case. Other courts have held similarly. For example, in *Decora, Inc. v. DW Wallcovering*, the court disqualified a firm of approximately 44 lawyers, noting that "[c]ounsel for the defendants represent that after the disqualification motion was filed Mr. Robinson was screened from all communications relating to this case. In the circumstances of this case, under the factors relied upon in *Cheng*, those measures were plainly too little, too late." 899 F.Supp. 132, 140 (S.D.N.Y.1995); *see also Baird*, 771 F.Supp. at 24 (disqualifying firm of 9 attorneys).

The fact that screening measures were not instituted from the outset of this litigation raises further doubts as to the Ruberti Firm's ability to screen itself from Ms. Greene. Disqualification of the Ruberti Firm is therefore necessary. As the Second Circuit found in *Cheng*, "[i]f after considering all of the precautions taken by the [firm whose disqualification is sought] this Court still harbors doubts as to the sufficiency of these preventive measures, then we can hardly expect [the former client] or members of the public to consider the attempted quarantine to be impenetrable." *Cheng*, 631 F.2d at 1058.

Although the Court rests its holding on the clear direction in Disciplinary Rule 5–105(D), the result is further supported by Canon 9's warning that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." This case presents, therefore, both the danger of tainting the underlying trial and the unacceptable appearance of impropriety condemned in Canon 9. *Cf. Emle Industries*, 478 F.2d at 565 (where public confidence in Bar would be undermined, "even an appearance of impropriety requires prompt remedial action by the court.").

## III. CONCLUSION

In summary, while the Court is sensitive to the desire of a client to be represented by the attorney of her choosing, it cannot in good ethical conscience permit the Ruberti Firm to continue representing the plaintiff in this case. The State has met the difficult burden required in *Evans* and has satisfied the Court that a conflict of interest exists. The Court is confident that Plaintiff will be able to obtain adequate representation from another source without extreme hardship.

Accordingly, Defendant's Motion to Disqualify is GRANTED and Plaintiff's Cross–Motion for Rule 11 Sanctions is DENIED. For the stated reasons, it is hereby **ORDERED** that the law firm of Ruberti, Girvin & Ferlazzo is disqualified from representing the plaintiff in this action.

**IT IS SO ORDERED.**