Kathleen YOUNG, Plaintiff,

v.

CENTRAL SQUARE CENTRAL SCHOOL DISTRICT and Antoinette Kulak, Defendants.

No. 599CV174FJSGLS.

United States District Court, N.D. New York.

July 25, 2002.

O'Hara & O'Connell, Syracuse, NY (James P. Evans, Dennis G. O'Hara, of counsel), for plaintiff.

The Law Firm of Frank W. Miller, East Syracuse, NY (Byron J. Babione, of counsel), for Defendants.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

### I. INTRODUCTION

Plaintiff commenced the present action against Defendants on February 5, 1999. On April 26, 1999, Defendants brought a motion to dismiss, which the Court granted in part and denied in part. *See generally* Memorandum–Decision and Order, dated March 29, 2000. The only causes of action remaining involve claims under the Americans With Disabilities Act ("ADA") and the Rehabilitation Act against Defendant Central Square Central School District (the "District").[1]

Presently before the Court are the District's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure or, in the alternative, to amend its answer to plead the affirmative defense of collateral estoppel, and its motion to disqualify Plaintiff's counsel. The Court heard oral argument in support of, and in opposition to, these motions on July 10, 2002. At that time the Court reserved decision and advised the parties that a written decision would be forthcoming. The following constitutes the Court's determination with respect to the pending motions.

### II. BACKGROUND

Plaintiff began working for the District on September 1, 1973. In October 1994, the District concluded that Plaintiff was having some problems and that she might be disabled. Therefore, the District required her to see a neuropsychologist, Dr. Anthony Blumetti. Although Dr. Blumetti is not a medical doctor, he concluded that Plaintiff might have some form of demyelinating disease that could affect both motor and cognitive functioning as well as result in personality alterations.

In December 1995, Plaintiff consulted Dr. Wolf, a neurologist, who diagnosed her with multiple sclerosis ("MS"). *See* Affidavit of Eugene Young, sworn to April 19, 2002 ("Young Aff."), Plaintiff's Exhibit "A," at ¶ 6. At the time that she was diagnosed, Plaintiff's primary symptom was that she tired easily and became fatigued. *See id.* at ¶ 8. Dr. Wolf advised her that this symptom was easily managed with intermittent rest periods during the day.

In June 1995, Plaintiff told her building principal, William McKee, that she had been diagnosed with MS. *See id.* at ¶ 9. Two months later, then-Superintendent Dale Hesser wrote to Plaintiff and acknowledged that the District had an obligation to provide her with reasonable accommodations to help her cope with her disability. *See* Declaration of Byron J. Babione, dated April 1, 2002 ("Babione Decl."), at Exhibit "7." At that time, Plaintiff did not request any accommodation from the District. *See* Young Aff. at ¶ 9.

On January 3, 1996, Plaintiff gave the District a medical release to obtain her medical records and information from her treating physicians. *See id.* at ¶ 10. Using this release, the District obtained Dr. Wolf's records, which were prepared in the form of letters, and sent them to Dr. Freeman, the District's physician. *See id.;* Babione Decl. at Exhibit "13."

Due to Plaintiff's continued problems with fatigue, a meeting was held on May 21, 1996, to discuss Plaintiff's disability and the accommodations that she needed to perform her job in spite of her disability. At the meeting, Dr. Wolf confirmed that Plaintiff suffered from MS and sug-

---

1. At oral argument on the motion to dismiss, Plaintiff voluntarily withdrew her claims under the ADA and the Rehabilitation Act against Defendant Kulak.

gested several accommodations to help her cope with this disability.

In August 1996, the District transferred Plaintiff to Cleveland Elementary School. Plaintiff alleges that this transfer significantly increased her commuting time and exacerbated the chronic fatigue that she was experiencing as a result of the MS. *See* Young Aff. at ¶ 20. On September 6, 1996, Plaintiff wrote to David Redmore, the District's Executive Director for Personnel Services, and formally requested that the District transfer her to the District's Intermediate School ("CSI"), which was much closer to her home. *See* Babione Decl. at Exhibit "20." Mr. Redmore responded to this request twice. On September 9, 1996, he sent a memo to Plaintiff, informing her that her request had been forwarded to Dr. Doherty, the District's Superintendent, for his consideration. Three days later, Mr. Redmore sent a second memo to Plaintiff in which he referred to a telephone conversation that he claimed to have had with Plaintiff on September 2, 1996, in which he claimed that Plaintiff had withdrawn a previous request for such a transfer.[2] *See id.* at Exhibit "20." Mr. Redmore asked Plaintiff to confirm that she was withdrawing that request in writing. *See id.* Plaintiff did not do so.

On November 1, 1996, the District's lawyers sent Plaintiff a letter, indicating that the District could no longer allow her to continue to serve in her position as a Reading Teacher because her level of performance for the past three years had been unacceptable. *See* Babione Decl. at Exhibit "24." The District's attorneys also informed Plaintiff that if she did not file an application for disability retirement by November 25, 1996, the District would pres-

ent disciplinary charges to the Board of Education on December 2, 1996. *See id.* Plaintiff's husband alleges that, as a result, he revoked the medical authorization that Plaintiff had previously given to the District because he no longer believed that the District would work with Plaintiff in good faith. *See* Young Aff. at ¶ 30.

On November 27, 1996, Plaintiff's attorney made a written request that the District accommodate Plaintiff by transferring her to a school closer to her home, by providing her with a teacher's aide to assist her and by taking affirmative steps to improve the communication channels between Plaintiff and the classroom teachers. *See* Babione Decl. at Exhibit "25." The District did not respond to this letter. On December 14, 1996, Plaintiff's attorney made another written request for these accommodations. *See* Babione Decl. at Exhibit "27." In response, the District agreed to meet with Plaintiff to discuss her requests. *See* Babione Decl. at Exhibit "28."

On January 9, 1997, a meeting was held to discuss accommodations. *See* Babione Decl. at Exhibit "31" and Exhibit "33." The parties reached an agreement that the following accommodations were reasonable and necessary: (1) the District would transfer Plaintiff to CSI as a Reading Teacher effective January 31, 1997; (2) the District would hire a part-time teaching assistant to work with Plaintiff from 12:00 to 3:00 p.m. daily, beginning January 31, 1997; (3) the District would prepare a written "ADA–504" plan illustrating Plaintiff's condition and the accommodations; (4) the District would insure that Plaintiff had at least two meetings with the teacher she replaced at CSI during "Regents

---

2. In his affidavit submitted in support of the present motion, Mr. Redmore clarified that the telephone call referred to in his September 12, 1996 memo occurred on September 9,

1996, not September 2, 1996. *See* Affidavit of David A. Redmore, sworn to May 2, 2002, at ¶ 9.

Week" to arrange for transfers and to discuss students, planning and related matters; and (5) the District would schedule regular meetings involving Plaintiff, Ms. Costello and CSI principal, Joann Tharrett, to discuss the situation and to help evaluate the placement and accommodations. *See* Babione Decl. at Exhibit "31."

District officials presented the agreed-upon accommodations to the Board of Education as "suggestions" that Plaintiff had made to assist her with her disability. *See id.* At the same time, the District's attorneys informed the Board that they did not have any medical information to support Plaintiff's claimed disability. The Board did not approve the agreed-upon accommodations. On January 23, 1997, the District's attorneys wrote to Plaintiff's attorney and informed him that the Board had decided that, without additional medical information, it would not provide the accommodations because of its concerns about "the potential costs of your proposed accommodations and their potential impact on employees and students." *See* Babione Decl. at Exhibit "33."

Approximately a month later, the District requested a medical release. *See id.* at Exhibit "42" at 112. Plaintiff promptly signed the release and returned it to the District. *See* Plaintiff's Exhibit "D." Thereafter, in March 1997, the District required Plaintiff to undergo another neuropsychological evaluation with Dr. Blumetti. *See* Babione Decl. at Exhibit "35." On April 25, 1997, Dr. Blumetti provided the District with his report, in which he recommended very similar accommodations to those that Dr. Wolf had requested in May 1996. *See* Babione Decl. at Exhibit "36." Specifically, Dr. Blumetti advised the District to take steps to reduce Plaintiff's fatigue and stress, which exacerbated her cognitive disruption.

On May 5, 1997, the District approved the hiring of a part-time teaching assistant to help Plaintiff for the few weeks remaining in the school year. *See* Babione Decl. at Exhibit "38." On May 7, 1997, the District relieved Plaintiff of her bus supervision duties and gave her a second rest period at the end of the school day. *See id.* The District did not implement Dr. Blumetti's other recommendations that school year. However, in August 1997, the District approved Plaintiff's transfer to CSI and appointed a full-time teacher's aide to assist her. *See* Babione Decl. at Exhibit "44" at 57.

Plaintiff began teaching at CSI in August 1997. According to Plaintiff, the District continued to require her to "push-in" to a number of classrooms and did not provide extra time for her to move between classrooms. *See* Tr. at 2264.[3] She also contends that the District expanded her duties to require that she teach a full classroom of students, including special education students, who were not eligible for the remedial program. *See id.* at 2170–71. Plaintiff received a negative evaluation for her perceived shortcomings in conducting the full-class instruction. *See id.* at 2164–65.

On January 26, 1998, the Board of Education voted to bring disciplinary charges against Plaintiff pursuant to § 3020–a of New York Education Law. There were fifty-three specifications in Charge One (Incompetence and/or inefficiency) and seven specifications in Charge Two (Mental and/or physical incapacity to teach). *See* Babione Decl. at Exhibit "3." Initially, Plaintiff was suspended with pay and directed not to report to work pending de-

---

**3.** The transcript ("TR") referred to in this Memorandum–Decision and Order is . the transcript of Plaintiff's administrative disciplinary hearing.

termination of the charges. On May 27, 1998, the District assigned Plaintiff to a position in CSI's library, where she was assigned to stack books. *See* Young Aff. at ¶ 41.

The District commenced a hearing under § 3020–a, and a hearing officer convened a pre-hearing conference on April 20, 1998. At that conference, he identified several problems with the District's charges and sent the District back to re-formulate the charges. He held a second conference on September 15, 1998, and the hearing commenced on October 19, 1998. Sworn testimony was taken from thirty-eight witnesses over the course of the next twelve months and approximately 160 exhibits were entered into evidence. The hearing closed on October 19, 1999.

On July 19, 2000, the Hearing Panel issued its determination, finding that the District had proven the charges, *see* Babione Decl. at Exhibit "3" at ¶ 36, and concluded that Plaintiff was not able to do her job and imposed a conditional dismissal; i.e., a six-month unpaid leave period to allow her to apply for disability retirement, at the end of which she would be dismissed from service. *See id.* at 52.[4]

Plaintiff challenged that determination pursuant to Education Law § 3020–a(5). On December 26, 2000, the New York Supreme Court, Onondaga County (Murphy, J.), held that under the limited grounds set forth in § 7511 of the New York Civil Practice Law and Rules he could not vacate the Hearing Panel's determination. On July 27, 2001, the Fourth Department affirmed that decision.

Based upon these facts, Defendants move for summary judgment, in part on the ground that the doctrine of collateral estoppel requires dismissal of this action. As noted, Defendants have also moved to disqualify Plaintiff's counsel. The Court will address each of these motions in turn.

## III. DISCUSSION

### A. Collateral Estoppel

 Collateral estoppel prevents "a party from raising a specific factual or legal issue in a second action when the party had a full and fair opportunity to litigate the issue in a prior proceeding." *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 162 F.3d 724, 731 (2d Cir.1998) (citation omitted). Specifically, collateral estoppel is applicable when " '(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.' " *Id.* (quoting *Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 593 (2d Cir.1991)).

 The party seeking to rely upon collateral estoppel " 'bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues.' " *Duamutef v. Hendry,* No. 91–CV–940, 1996 WL 691537, *2 (N.D.N.Y. May 30, 1996) (quoting *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991)).

The District asserts that the Hearing Panel's decision, which was affirmed by both the New York State Supreme Court and the Appellate Division, precludes the relitigation of the reasonable accommodation issues in this action. Therefore, the District requests leave to amend its an-

---

**4.** In its decision, the Hearing Panel made clear that it would not and could not determine whether the District had complied with the ADA.

swer pursuant to Rule 15(c)(2) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1738 to assert the defense of collateral estoppel.[5]

In the § 3020–a proceeding, one of the charges that the District lodged against Plaintiff was that she "lack[ed] the mental and/or physical capacity to perform the essential functions of her teaching position, even with the District providing reasonable accommodation of her disability." *See* Babione Decl. at Exhibit "3" at 14. The District had the burden of proving this charge by a preponderance of the evidence. *See Martin v. Ambach,* 67 N.Y.2d 975, 977, 502 N.Y.S.2d 991, 494 N.E.2d 96 (1986). After reviewing each of the specifications under this charge individually, the Hearing Panel concluded that the District had met its burden and that Plaintiff lacked the capacity to perform the essential functions of her job. *See* Babione Decl. at Exhibit "3" at 50. The Hearing Panel also concluded that Plaintiff had not demonstrated that she could perform the essential functions of her job with reasonable accommodation. *See id.* at 59. In this regard, the Hearing Panel noted that, despite being provided with an assistant and being moved to a school closer to her home, Plaintiff continued to demonstrate a pattern of instructional problems. *See id.*

The issue of whether Plaintiff could perform the essential functions of her job was necessary to the Hearing Panel's finding that Plaintiff was "guilty" of the charge lodged against her. Moreover, that issue was actually litigated and decided. Further, there can be no dispute that Plaintiff had a full and fair opportunity to litigate that issue before the Hearing Panel.

Hearings were held on twenty-three different days from April 30, 1998 until October 19, 1999. *See id.* at 1. At these hearings, both parties, through their representatives, submitted oral and documentary evidence and examined and cross-examined witnesses. The record was in excess of 4,700 pages and some 160 exhibits were entered into evidence. *See id.* In addition, both parties submitted post-trial briefs. *See id.* at 1–2.

Thus, the Court must determine whether the issue that the Hearing Panel decided is identical to the issue raised in the present litigation; i.e., whether Plaintiff was able to perform the essential functions of her job with reasonable accommodations within the meaning of the ADA. Certainly, the issue of whether Plaintiff could perform the essential functions of her job without accommodation was decided during the § 3020–a proceeding. The Hearing Panel found that she could not, and Plaintiff does not appear to challenge this conclusion. However, with respect to the issue of accommodations, the Hearing Panel explicitly limited its discussion: "[O]ur analysis of the employer's obligations to accommodate [Plaintiff] will be confined to considering its attempts at correction and remediation in the context of section 3020–a(4)(a) of the Education Law." *See id.* at 52.

Section 3020–a(4)(a) provides, in pertinent part, that

[t]he written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or

---

**5.** The District acknowledges that, in his November 14, 2001 decision, Magistrate Judge Sharpe denied its request to assert a collateral estoppel defense based upon the Hearing Panel's decision affirming Plaintiff's termination for being unfit to teach pursuant to Education

Law § 3020–a. However, the District notes that, at the time that it made its earlier request, neither the New York State Supreme Court nor the Appellate Division had reviewed or affirmed the Hearing Panel's decision.

other action, if any, shall be taken by the employing board. **At the request of the employee, in determining what, if any, penalty or other action shall be imposed, the hearing officer shall consider the extent to which the employing board made efforts towards correcting the behavior of the employee which resulted in charges being brought under this section through means including but not limited to: remediation, peer intervention or an employee assistance plan.**

N.Y. Educ. Law § 3020–a(4)(a) (McKinney 2001) (emphasis added).

Thus, § 3020–a makes clear that the issue of whether the District was required to provide any accommodations to Plaintiff was not necessary to the Hearing Panel's determination that Plaintiff was guilty of the charge brought against her; i.e., that she could not perform the essential functions of her job. Moreover, under § 3020–a, the issue of accommodations is only relevant at the penalty phase of the proceedings and even then the Hearing Panel will only consider this issue if the employee requests such consideration.

To the contrary, in the present case, to establish a *prima facie* case of discrimination under the ADA and the Rehabilitation Act, Plaintiff is required to demonstrate that, among other things, she can perform the essential functions of her job with reasonable accommodations. *See Stone v. City of Mt. Vernon,* 118 F.3d 92, 96–97 (2d Cir.1997). It was not necessary for Plaintiff to establish this fact at the hearing and, more importantly, as long as the District was able to prove that Plaintiff was unable to perform the essential functions of her job, the Hearing Panel could conclude that she was "guilty" of the charges,

whether or not the District had provided her with any accommodations. Therefore, the issue of "reasonable accommodations" was not an issue which was necessary to the Hearing Panel's decision.[6] Accordingly, the Court concludes that collateral estoppel does not bar Plaintiff from litigating the issue of whether the District discriminated against her by refusing or failing to provide her with reasonable accommodations so that she could perform the essential functions of her job.

**B. Defendant's summary judgment motion**

*1. Summary judgment standard*

Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (quotation and footnote omitted); *see* Fed. R.Civ.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, . . ."). To meet this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,*

---

**6.** It is also important to note that under § 3020–a(4)(a) the accommodations are aimed at "correcting" the behavior of the employee not at providing reasonable accom-

modations to the employee to assist her in performing the essential functions of her position.

*Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." *Fincher v. County of Westchester,* 979 F.Supp. 989, 995 (S.D.N.Y.1997) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990)). The Court, however, must not weigh the evidence but instead is "required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (citations omitted).

### 2. Plaintiff's ADA and Rehabilitation Act claims

Under the ADA, a covered employer is prohibited from discriminating against an otherwise qualified employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and the other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[7] The statute defines "qualified individual with a disability" to mean "an individual

with a disability who, *with or without reasonable accommodation,* can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). The ADA defines the term "discriminate" to include "[n]ot making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of the ... [employer's] business ..." 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

■ Under the ADA, a plaintiff can establish a *prima facie* case by showing

(1) that [s]he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of [her] disability, (3) that with reasonable accommodation, [s]he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations.

*Stone,* 118 F.3d at 96–97 (citing *Lyons v. Legal Aid Society,* 68 F.3d at 1515).[8]

■ Although the term "essential functions" is not defined in the ADA, it is generally defined in the ADA regulations

7. "The regulatory schemes of the ADA and the Rehabilitation Act are similar." *Stone,* 118 F.3d at 96. The Rehabilitation Act prohibits disability-based discrimination on the part of government agencies and other recipients of federal funds. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." 29 U.S.C. § 794(a).

　　Regulations relevant to the Rehabilitation Act define the term "qualified handicapped

person" as one "who, *with reasonable accommodation,* can perform the *essential functions* of the job in question[.]" 45 C.F.R. § 84.3(k)(1) (emphasis added). These regulations require recipients of federal funds to "make *reasonable accommodation* to the known physical or mental limitations of an otherwise qualified handicapped ... employee unless the recipient can demonstrate that the accommodation would impose an *undue hardship* on the operation of its program." 45 C.F.R. § 84.12(a) (emphasis added).

8. These are the same elements that a plaintiff must demonstrate to establish a *prima facie* case under the Rehabilitation Act.

to mean "the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The regulations provide a non-exclusive list of illustrations of the reasons that a given function might be considered essential. *See* 29 C.F.R. § 1630.2(n)(2). As the Second Circuit has noted, "[t]o avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir.1995) (citing *Hall*, 857 F.2d at 1079). Moreover, determination of the "essential functions" of a particular position is important because "an employer is not required to accommodate an individual with a disability by eliminating essential functions from the job." *Id.* (citations omitted). However, if rather than eliminating an essential function of the job, an accommodation merely permits the individual with a disability to perform that function, then the employer has an obligation to provide that accommodation as long as it is reasonable.

The ADA sets out a non-exclusive list of different methods of accommodation, including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, ..." 42 U.S.C. § 12111(9). Likewise, the ADA regulations state that an employer must provide

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a[n] ... employee with a disability to enjoy equal benefits and privileges

of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(*o*)(1)(ii), (iii).

■ However, an accommodation is reasonable "only if its costs are not clearly disproportionate to the benefits that it will produce." *Borkowski*, 63 F.3d at 138 (citations and footnote omitted).

■ "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.2000) (citing *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996); 29 C.F.R. § 1630.2(*o*)(3)). When that process breaks down and an employee seeks relief on the ground that her employer failed to "reasonably accommodate" her disability, the Second Circuit has established a two-step process to determine whether the employer's failure to provide a proposed accommodation violates the ADA. First, "the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions." *Borkowski*, 63 F.3d at 138. "However, the ADA does not require employees to suggest a specific type of accommodation in order to trigger the employer's obligation to investigate which reasonable accommodations, if any, might be appropriate." *Worthington v. City of New Haven*, No. 3:94–CV–00609, 1999 WL 958627, *13 (D.Conn. Oct.5, 1999) (citations omitted). "If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan*, 205 F.3d at 566 (citation omitted).

214

■■■■ If the interactive process breaks down, " 'courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.' " *Worthington*, 1999 WL 958627, at *13 (quotation, citation and footnote omitted).[9] In this regard, "failure to provide the information [necessary to determine what accommodations can be provided] may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir.1996); *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir.1998) (noting that when the employee "fail[s] to hold up her end of the interactive process by clarifying the extent of her medical restrictions, [the employer] cannot be held liable for failing to provide reasonable accommodations." (citation omitted)). This determination, however, "must be made in light of the circumstances surrounding a given case." *Beck*, 75 F.3d at 1136.

■■■■ The District contends that although Plaintiff can establish the first element of her *prima facie* case—that she suffers from a disability—she cannot meet the remaining three elements. In this regard, the District argues that Plaintiff refused to engage in the "interactive pro-

cess" contemplated by the ADA, while the District remained actively engaged in ascertaining Plaintiff's needs and provided her with all requested reasonable accommodations. Despite its efforts, however, the District argues that Plaintiff could not perform the essential functions of her job. Therefore, the District asserts that Plaintiff is not "otherwise qualified" to work in her position.

To the contrary, Plaintiff argues that, at the very least, the overwhelming evidence creates an issue of fact regarding whether the District violated the ADA by discriminating against her by failing or refusing to grant her requests for reasonable accommodations.

After reviewing the entire record in this case, the Court concludes that there are a number of issues of fact that preclude summary judgment with respect to Plaintiff's ADA and Rehabilitation Act claims. The parties agree on one point—prior to May 21, 1996, Plaintiff did not request that the District provide her with any accommodations.[10] However, after that point in time, the parties disagree about almost everything else.

The first issue of fact concerns exactly what accommodations Plaintiff and her physician, Dr. Wolf, requested at the May 21, 1996 meeting—just a rest period as the District contends or intermittent rest peri-

---

**9.** In *Worthington*, the plaintiff requested an ergonomic chair and a modification of her duties to cover for an absent co-worker, which required a significant amount of standing. Although the plaintiff eventually received her chair, her employer did not provide this accommodation until a full two years after her initial request and almost one year after she presented her physician's prescription for the chair. In addition, her employer never attempted to eliminate or modify her duty to cover for her absent co-worker, despite the employer's knowledge that the plaintiff had an extremely limited ability to perform work while standing. Under these

circumstances, the court concluded that the employer had "dragged its feet" and, therefore, had "failed to make a reasonable, good faith effort to determine and implement reasonable accommodations in consultation with the plaintiff, and thus discriminated against her in violation of the ADA and Section 504 [of the Rehabilitation Act]." *Worthington*, 1999 WL 958627, at *14.

**10.** Plaintiff also acknowledges that presently she is totally disabled and unable to work and that she has been in this condition since approximately August 2001. *See* Young Aff. at ¶ 44.

ods throughout the day, a transfer to a school closer to her home, and modifications to her job to permit her to work out of a single classroom (rather than traveling from classroom to classroom) and to relieve her of her eighth-grade study hall at the end of the day. If the Court accepts Plaintiff's version of the facts and draws all reasonable inferences therefrom, as it must on a motion for summary judgment, then it appears that, at least initially, the District fell far short of providing Plaintiff with the reasonable accommodations she requested.

Also troublesome, and pertinent to the issue of whether the District met its obligations to accommodate Plaintiff, is the fact that after the May 21, 1996 meeting, in August 1996, the District transferred Plaintiff to the school farthest from her home, despite her alleged request to be transferred to a school closer to her home. As justification for this reassignment, the District now states that Cleveland Elementary School, to which Plaintiff was assigned, was a single-level building (versus the multi-level structure of CSI) and that the children were younger and, thus arguably, more manageable. However, there is nothing in the record to indicate that the District apprised Plaintiff of the reasons for its decision to transfer her to Cleveland Elementary School or took into account Dr. Wolf's request that Plaintiff be assigned to a school closer to her home to assist in managing her fatigue. According to Plaintiff, this transfer meant a longer commute, which increased her fatigue and had a significant impact on her condition. In addition, according to Plaintiff, the District only supplied her with one rest period—at the beginning of the day, which did not help with her fatigue—and ignored the remainder of Dr. Wolf's recommendations.

There is also a dispute about the reason that the District did not respond to Plaintiff's written request on September 6, 1996, for a transfer to a school closer to her home. The District contends that Plaintiff withdrew this request. Plaintiff denies ever having withdrawn this request. In addition, there is a question about whether the Superintendent knew about Plaintiff's request for a transfer to CSI. There is also a question as to whether certain District officials provided the Board of Education with all of the information that they had concerning Plaintiff's condition, her requests for accommodations, and their conversations with Dr. Wolf.

On the other hand, the District cannot be held totally to blame for the breakdown in the interactive process. In November 1996, Plaintiff and her husband instructed Dr. Wolf not to communicate with the District without notifying them first. Therefore, Dr. Wolf did not respond to the District's request for information in the Fall of 1996. However, in February 1997, Plaintiff, once again, provided the District with a medical release immediately upon request. Nonetheless, at least for a short period of time, the District was arguably unable to ascertain the current status of Plaintiff's disability.

Based upon these conflicting statements concerning the District's willingness to reasonably accommodate Plaintiff so that she could perform the essential functions of her job and Plaintiff's ability to perform these functions even with reasonable accommodations, the Court denies the District's motion for summary judgment.

### C. Attorney disqualification

 It is well-established in the Second Circuit that a motion to disqualify one's former counsel is committed to the court's sound discretion. *See Marshall v. State of N.Y. Div. of State Police*, 952 F.Supp. 103, 106 (N.D.N.Y.1997) (citations omitted). Moreover, courts in this Circuit

view motions to disqualify with disfavor. *See id.* (citation omitted). Thus, "[a] party seeking disqualification must meet a high standard of proof before disqualification will be granted." *Id.* (citation omitted).

■ Nonetheless, the Second Circuit has concluded that in order to ensure adherence to the guidelines set forth in the American Bar Association Code of Professional Responsibility, an attorney may be disqualified from representing a client if

"(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or is likely to have had access to, relevant privileged information in the course of his prior representation of the client."

*Id.* at 107 (quoting *Evans*, 715 F.2d at 791 (2d Cir.1983) (citations omitted)) (other citation omitted).; *see also Schwed v. Gen. Elec. Co.*, 990 F.Supp. 113, 115 (N.D.N.Y. 1998) (quotation omitted); *SMI Indus. Canada Ltd. v. Caelter Indus., Inc.*, 586 F.Supp. 808, 815 (N.D.N.Y.1984) (citations omitted).

With regard to the "substantial relationship" element of the disqualification test, the Second Circuit has established that "[d]isqualification should be granted 'upon a showing that the relationship between the issues in the prior and present cases is "patently clear" [or] when the issues involved have been "identical" or "essentially the same."'" *Marshall*, 952 F.Supp. at 109 (quotation omitted).

■ With regard to the issue of whether the attorney involved in the prior case had access to confidences or other privileged information " 'where "it can reasonably be said that in the course of the former representation the attorney might have acquired the information related to

the subject matter of his subsequent representation," it is the court's duty to order the attorney disqualified.' " *Id.* (quotation omitted). If the Court determines that the attorney should be disqualified, then it must also decide whether her present firm must be disqualified.

■ Pursuant to Disciplinary Rule 5–105(D), " '[i]f a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with [her] or [her] firm, may accept or continue such employment.' " *Id.* at 110 (quoting DR 5–105(D)) (footnote omitted). Moreover, Disciplinary Rule 5–105(D) creates a presumption that the attorneys within a law firm will communicate client confidences. *See id.; see also* 22 N.Y.C.R.R. § 1200.24(d); *Mitchell v. Metro. Life Ins. Co.*, No. 01 CIV. 2112, 2002 WL 441194 (S.D.N.Y. Mar.21, 2002); *Schwed*, 990 F.Supp. at 115. This presumption may be rebutted if "appropriate and effective screening measures are instituted to prevent the dissemination of confidences by a disqualified attorney." *Marshall*, 952 F.Supp. at 110 (citations omitted). However, "while screening devices may be used in some circumstances to prevent the disclosure of confidences and secrets from a prior representation, . . ., they cannot be used where the circumstances are such that a court cannot determine that they will effectively prevent disclosure." *Id.* at 111. Thus, "a screening device implemented only after a disqualified lawyer has been with a firm will not provide adequate protection of confidences." *Id.* (citations omitted). Furthermore, as Judge McAvoy stated in *Marshall*, in instances in which the law firm is relatively small, courts have found that there are doubts that even the most stringent screening devices would be effective. *See id.* at 112.

■ Moreover, "[t]he Second Circuit has expressed consistent skepticism about screening as a remedy for conflicts of interest and declared that such procedures ultimately must be rejected if they are subject to doubt." *Mitchell*, 2002 WL 441194, at \*9 (citations omitted). Likewise, "the New York Code of Professional Responsibility does not recognize the use of screening devices except in cases involving former government lawyers or judges." *Id.* (citation omitted). In addition, "the ABA House of Delegates [recently] voted to reject a proposal to permit screening to avoid disqualification." *Id.* (citation omitted). Thus, "[c]ourts have only approved screening procedures in the limited circumstances where a conflicted attorney possesses information unlikely to be material to the current action and has no contract with the department conducting the current litigation, which typically occurs only in the context of a large firm." *Id.* (citations omitted). In addition, the law firm must have established the screening measures "from the first moment the conflicted attorney transferred to the firm or, at a minimum, when the firm first received actual notice of the conflict." *Id.* (citations omitted). Finally, even if such measures are taken, if there is still an "appearance of impropriety," the court should disqualify the attorney and her firm. *See Cheng v. GAF Corp.*, 631 F.2d 1052, 1058–59 (2d Cir.1980), *vacated on other grounds*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981).

■ The District asserts that O'Hara & O'Connell, Plaintiff's counsel, must be disqualified because it employs Jennifer Speller, who represented the District in this case while she was employed at her former law firm, Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C. (the "Ferrara Firm"). To support this argument, the District relies upon the affidavit of Henry F. Sobota, a partner in the Ferrara Firm. *See* Affidavit of Henry F. Sobota, sworn to March 29, 2002 ("Sobota Aff."), at ¶ 1.[11] Mr. Sobota was the lead counsel handling the prosecution of the § 3020–a charges against Plaintiff for the District. *See id.* at ¶ 3. According to Mr. Sobota, Ms. Speller was employed at the Ferrara Firm as an associate from August 26, 1998 until February 7, 2001, during which time she was involved in the representation of the District generally and with regard to Plaintiff's case in particular. *See id.* at ¶ 4. Ms. Speller performed various tasks related to Plaintiff's case: identifying legal issues, memorandum preparation, and attendance at meetings concerning the case. *See id.* Moreover, when Plaintiff commenced this action, Ms. Speller performed various research tasks on this file and had access to confidential information regarding the case. *See id.* at ¶ 5.

Mr. Sobota's review of the Ferrara Firm's billing records indicates that Ms. Speller spent a total of 12.7 hours working on Plaintiff's § 3020–a matter. *See id.* at ¶ 6. The firm's billing records also indicate that Ms. Speller spent 4.6 hours working on the present case, including legal research and writing regarding abstention and the elements of an ADA claim. *See id.* at ¶ 7. Finally, Mr. Sobota states that it is his opinion that Ms. Speller had access to highly sensitive information regarding this case and matters of defense strategies, some of which he discussed with her. *See id.* at ¶ 11.

In response, Plaintiff argues that the District's motion to disqualify O'Hara & O'Connell is baseless. Ms. Speller states that while she was employed at the Fer-

---

11. Mr. Sobota notes that Ms. Speller also worked for The Law Firm of Frank Miller, the District's present counsel, from February 2001 until April 15, 2001. *See* Sobota Aff. at ¶ 9.

rara Firm she conducted general research regarding the issue of an employer's obligation to provide an employee with accommodations under the ADA. *See* Affidavit of Jennifer G. Speller, sworn to April 22, 2002, at ¶ 4. As part of that assignment, Mr. Sobota told her that Plaintiff was a teacher for the District who had been diagnosed with MS and who the District thought was performing inadequately. *See id.* at ¶ 5. Mr. Sobota also told her that Plaintiff was falling asleep in class and had recently crashed her car. *See id.* Ms. Speller asserts that she received no other information about Plaintiff or her employment with the District. *See id.* at ¶ 6. She also claims that she had no access to District documents, employees or officers, or to discussions with lawyers at the Ferrara Firm regarding the matter. *See id.* Nor did she have any involvement with Plaintiff's § 3020–a proceeding. *See id.* at ¶ 7.

Subsequently, Mr. Sobota assigned Ms. Speller to research the abstention doctrine and whether it applied to this case. *See id.* at ¶ 8. Mr. Sobota informed Ms. Speller that Plaintiff had been found unfit by the § 3020–a Hearing Panel. *See id.* Ms. Speller asserts that her research on abstention was general and that she received no particular facts about Plaintiff's suit, the District's defense strategies, or facts underlying Plaintiff's lawsuit. *See id.* Moreover, Ms. Speller states that she had no client contact during either of her research assignments and no access to client documents or information. *See id.* at ¶ 11. She also asserts that she has no knowledge of the District's strategy for defending the case and no knowledge of any aspect to the case. *See id.* at ¶ 13. Finally, Ms. Speller states that other than reviewing Mr. Sobota's affidavit in support of this motion and drafting her own affidavit in response, she has had no discussions about this case with anyone at O'Hara & O'Connell; nor has she ever seen the file or been asked to work on this case. *See id.* at ¶ 14.

Although Ms. Speller was not the attorney of record for the District when she worked at the Ferrara Firm, she clearly performed some legal work with respect to Plaintiff's current dispute with the District. Furthermore, although Ms. Speller asserts that she did not have access to confidential information, Mr. Sobota disputes this assertion, claiming that not only did Ms. Speller have access to such information but that he discussed the case and defense strategies with her. Based upon the fact that Ms. Speller was admittedly at least minimally involved in this case while at the Ferrara Firm, "it can reasonably be said that ... [Ms. Speller] might have acquired the information related to the subject matter of [this litigation]." *Marshall,* 952 F.Supp. at 109.

█ Given the facts and circumstances as set forth, the Court concludes that Ms. Speller must be disqualified from representing Plaintiff. The Court must now determine whether O'Hara & O'Connell must be disqualified due to its association of Ms. Speller. As noted, Disciplinary Rule 5–105(D) constitutes a presumption that client confidences will be shared among the attorneys within a law firm. Although this presumption may be overcome in some instances by appropriate and effective screening measures to prevent dissemination of confidences by a disqualified attorney, such devices "cannot be used where the circumstances are such that a court cannot determine that they will effectively prevent disclosure." *Marshall,* 952 F.Supp. at 111. In the present case, although O'Hara & O'Connell states that the file in this case is kept in a conference room across from the offices of the attorneys working on the case, there is nothing in the record to suggest that any formal institutional mechanisms were in place before or after Ms. Speller's arrival at

O'Hara & O'Connell that would have insulated her from this case.

As in *Cheng*, which involved a thirty-five-lawyer firm, the relatively small size of O'Hara & O'Connell raises doubts in the Court's mind that even the most stringent screening mechanisms could be effective in the present case.[12] The mere placement of the case file in a conference room near the offices of the attorneys working on this case is not a sufficient screening mechanism—to the extent that it can be considered a screening mechanism—to ensure that the other attorneys at O'Hara & O'Connell are screened from Ms. Speller. As the Second Circuit noted in *Cheng*, "[i]f after considering all the precautions taken by [the firm whose disqualification is sought] this Court still harbors doubts as to the sufficiency of these preventive measures, then we can hardly expect [the former client] or members of the public to consider the attempted quarantine to be impenetrable." *Cheng*, 631 F.2d at 1058.

Moreover, notwithstanding the directive of Disciplinary Rule 5–105(D), Canon 9 warns that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Although not calling into question the good faith of O'Hara & O'Connell and Ms. Speller in dealing with this sensitive issue, the Court finds that this case presents both the danger of tainting the underlying trial and the unacceptable appearance of impropriety against which Canon 9 warns. Accordingly, the Court grants the District's motion to disqualify O'Hara & O'Connell from representing Plaintiff in this action.[13]

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions and oral arguments and the applicable law, and for the reasons stated herein and at oral argument, the Court hereby

**ORDERS** that Defendant's motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to amend its answer to add the affirmative defense of collateral estoppel is **DENIED**; and the Court further

**ORDERS** that Defendant's motion to disqualify O'Hara & O'Connell from representing Plaintiff in this action is **GRANTED**; and the Court further

**ORDERS** that Plaintiff is to notify the Court and opposing counsel in writing within **ninety days** of the date of this Order of the name of her new counsel or her intention to proceed with this action

---

**12.** In *Cheng*, the Second Circuit concluded that "[a]lthough we do not question [the disqualified lawyer's] integrity or his sincere efforts to disassociate himself from the *Cheng* case, we are not satisfied that under the facts of this case the screening will be effective, thus we look to Disciplinary Rule 5–105(D) and order the district court to disqualify [his] firm." *Cheng*, 631 F.2d at 1058 (citations and footnote omitted).

**13.** The Court makes this decision reluctantly not only because of respect for O'Hara & O'Connell, which deservedly enjoys a fine reputation in the legal community, but also because of the enormous amount of effort O'Hara & O'Connell has expended on behalf of Plaintiff in both this action and in the related § 3020–a proceeding and the hardship its absence will cause. The Court wants to emphasize that neither O'Hara & O'Connell nor Ms. Speller did anything improper. Rather, they were faced with a problem that plagues smaller law firms on a continuing basis, especially in a relatively small legal community—a problem which inevitably leads, in some instances, to a situation which makes it impossible to avoid the appearance of impropriety and leaves the Court with no

*pro se.*[14]

**IT IS SO ORDERED.**

choice but to disqualify both the individual attorney and her law firm.

14. Once the Court has received this information, it will contact the parties to schedule a telephone conference for the purpose of setting a trial date for this matter.