# Third District Court of Appeal

## State of Florida

Opinion filed December 27, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-1959
Lower Tribunal No. 07-46972
_____

**David Canta and Corazon Canta,**
Petitioners,

vs.

**Philip Morris USA, Inc. and R.J. Reynolds Tobacco Co.,**
Respondents.

On Petition for Writ of Certiorari from the Circuit Court for Miami-Dade County, Rodolfo A. Ruiz, Judge.

The Ferraro Law Firm and James L. Ferraro and Juan P. Bauta, II, for petitioners.

Arnold & Porter Kaye Scholer and Frances Daphne O'Connor and Geoffrey J. Michael, (Washington, D.C.), for respondent Philip Morris USA, Inc.; Carlton Fields Jorden Burt and Jeffrey A. Cohen, Benjamine Reid and Douglas J. Chumbley; Jones Day and Jason T. Burnette (Atlanta, GA), for respondent R.J. Reynolds Tobacco Company.

Before SALTER, EMAS and LOGUE, JJ.

SALTER, J.

David and Corazon Canta, plaintiffs in an Engle-progeny[1] tobacco case, petition for a writ of certiorari quashing a trial court order disqualifying their counsel. Concluding that the Cantas have not shown a departure by the trial court from the essential requirements of law—in this case, the provisions of applicable Rules Regulating The Florida Bar—we deny the petition.

I.      Facts and Procedural History

        A.      The Alleged Conflict; Early Disqualification Motions

The Cantas retained The Ferraro Law Firm ("Ferraro Firm") to represent them regarding their claims for injuries and damages from smoking cigarettes manufactured by the defendants/respondents, Philip Morris USA, Inc. ("PM") and R.J. Reynolds Tobacco Co. ("RJR"). The Cantas' lawsuit against PM and RJR commenced in 2007.

In 2015, the Ferraro Firm hired attorney Paulo Lima, who had previously been employed as an associate attorney at the New York and Miami offices of Hunton & Williams, LLP ("Hunton Firm"). Importantly, Lima worked for the Hunton Firm from 2005 through his 2015 departure, and during that period he performed legal work on behalf of PM, a client of the Hunton Firm. Lima's legal work, detailed in his timekeeping records, included legal research and drafting

---

[1] Engle v. Liggett Group, Inc., 945 So. 2d 1246 (Fla. 2006).

2

memoranda to assist PM in the defense of other <u>Engle</u>-progeny tobacco cases. As part of that work, Lima had access to PM's litigation databases and confidential PM documents, and he attended meetings regarding PM's legal strategy and defenses in tobacco cases. Ultimately, the time records disclosed almost 375 hours billed by Lima to PM regarding <u>Engle</u>-progeny cases, and over 1500 billable hours on PM matters in total.

After Lima joined the Ferraro Firm in May 2015, he immediately began to represent clients of that firm in pending <u>Engle</u>-progeny cases, including several appeals in this Court. In his deposition taken in connection with another <u>Engle</u>-progeny case,[2] Lima testified that "one of the things I discussed with Mr. Ferraro here when I was discussing my employment," was that Lima would handle <u>Engle</u>-progeny cases. Lima went on to testify, however, and to substantiate in an affidavit, that (a) no one at the Ferraro Firm ever asked him to disclose any confidential information belonging to PM or RJR, and (b) at no time did Lima ever discuss any confidential information pertaining to PM or RJR with any employee or member of the Ferraro Firm.

In March 2016, PM and RJR began seeking the disqualification of the Ferraro Firm in pending <u>Engle</u>-progeny cases throughout Florida. The initial motions lacked significant details that were later obtained by PM and incorporated

---

[2] <u>Jacobson v. Philip Morris USA, Inc.</u>, No. 08-1195-CA-20 (Fla. 11th Cir. Ct. filed Jan. 10, 2008).

3

in subsequent motions in other cases. While several of the initial motions were denied (and petitions for certiorari directed at the denial orders were denied without elaboration), subsequent motions for disqualification of the Ferraro Firm in other pending Engle-progeny cases were granted. It is noteworthy, however, that the unsuccessful March 2016 motions to disqualify placed the Ferraro Firm on notice that Lima's former client, PM, claimed Lima had worked on confidential, Engle-related legal issues and strategy. Nonetheless, Lima continued to work on Engle-progeny cases after the Ferraro Firm became aware of Lima's work at PM and PM's objections.

Three months later, in June 2016, a trial court in the Orange County Circuit Court granted PM's motion to disqualify Lima and the Ferraro Firm in an Engle-progeny case styled Hall v. R.J. Reynolds Tobacco Co., No. 2014-CA-005690-O. Lima and the Ferraro Firm did not seek appellate review of that decision, which included detailed findings of the work done by Lima for PM as reflected on his time records. That court found that, among other things, Lima "researched cigarette design defect issues raised in Engle and the law of alternative causation, both of which are litigated in Engle progeny cases to this day, including . . . many Ferraro cases." The court also determined that "The affidavit of Kimberly Harlowe submitted by [PM] and not contested by the Ferraro Firm establishes that Mr. Lima had access to, and did access, [PM's] litigation databases and reviewed

4

internal [PM] documents, including highly confidential and privileged documents."

B.    Caro

In December 2016, a Florida appellate court reached the same conclusion as the trial court in Hall, quashing a Broward County Circuit Court order denying PM's motion to disqualify Lima and the Ferraro Firm in another Engle-progeny case. Philip Morris USA Inc. v. Caro, 207 So. 3d 944 (Fla. 4th DCA 2016). In Caro, the Fourth District rigorously analyzed the "two-prong test for determining whether disqualification is warranted," id. at 948, and applied the test to Lima's work for PM and his move to the Ferraro Firm.

Applying Rule Regulating The Florida Bar 4-1.9(a) and the first prong of that test, the court agreed with the trial court's analysis that there had been an attorney-client relationship between Lima and PM, creating an "irrefutable presumption that confidences were disclosed during the relationship." Id. (quoting State Farm Mut. Auto. Ins. Co. v. K.A.W., 575 So. 2d 630, 633 (Fla. 1991)). As to the second prong, however—whether the matter in which Lima or the Ferraro Firm[3] represented Caro regarding claims against PM "is the same or substantially related" to the matter in which Lima represented PM—the Fourth District disagreed with the trial court:

We disagree with the trial court's conclusion that Lima's work for PM

---

[3] Rule Regulating The Florida Bar 4-1.10(a) imputed any disqualification of Lima, while with the Ferraro Firm, to all other lawyers in that law firm.

5

was not substantially related to the issues in Caro's lawsuit against PM in which Lima is now Caro's counsel. In so ruling, the trial court departed from the essential requirements of law. While there are some issues relating to Caro's case, and indeed in every plaintiff's case involving Engle litigation, that are unique to, and distinct from, defense matters on which Lima previously worked, we cannot conclude that Lima's extensive prior representation of PM in defending and strategizing about Engle progeny cases was not substantially related to at least some of the issues here. As PM has argued, each Engle progeny case includes a plaintiff's expert witness who testifies about the defendant company's conduct relating to concealment of information about the health risks of smoking and defective design of cigarettes. This expert testimony is said to vary little from case to case. This reaches beyond a unique plaintiff's issue.

Id. at 949.

Concluding that PM's petition for certiorari should be granted, the Fourth District granted the petition, quashed the order denying PM's motion for disqualification, and directed the trial court to grant the motion. Caro moved for rehearing en banc, which was denied in January 2017.

### C.    This Case, and Lima's Termination of Employment

On March 1, 2017, citing Caro and other authorities, PM moved to disqualify Lima and the Ferraro Firm from further representation in the present case. The following day, RJR filed a similar motion, incorporating PM's recitation of the facts and law, but adding that RJR had a joint defense agreement with PM. RJR's motion attached an affidavit stating that, while employed at the Hunton Firm, Lima had access to confidential information about RJR and its defense of Engle-progeny lawsuits through a jointly-maintained tobacco litigation database.

6

Effective the next day, March 3, 2017, the Ferraro Firm terminated Lima's employment with the law firm. In its opposition to the PM and RJR motions for disqualification in this case ( Canta ) and other then-pending cases, the Ferraro Firm relied upon the previously-described affidavits of Lima and every lawyer in the Ferraro Firm disclaiming knowledge or discussion regarding any confidences of PM or RJR. The Ferraro Firm's opposition to disqualification in this case, filed March 6, 2017, also contended that the termination of Lima's employment mooted the disqualification motions and changed the analysis relied upon by the Fourth District months earlier in Caro.

In April 2017, the circuit court in Gadsden County, Florida, entered an order in another Engle-progeny case, Russ v. R.J. Reynolds Tobacco Co., No. 15000042 CA, granting PM's motion to disqualify Lima and the Ferraro Firm from the representation of the plaintiff in that case. Addressing Lima's departure from the Ferraro Firm, that court concluded that "the moment Mr. Lima joined the firm, [the Ferraro Firm] was eligible to be disqualified from representing [the plaintiff] in this case. . . . Mr. Lima's subsequent departure from [the Ferraro Firm] does not attenuate the taint which inured at the moment Mr. Lima became associated with [the Ferraro Firm]." The order of disqualification also concluded that "the credibility of the judicial system itself is also a worthy consideration, albeit not the only one."[4]

7

When the PM and RJR motions for disqualification were heard by the trial court in the present case, the Ferraro Firm, on behalf of its clients, argued that the imputed disqualification of all lawyers in the firm (R. Regulating Fla. Bar 4-1.10(a)) ended when Lima separated from the firm, and that any "irrefutable presumption" of conflict applicable to Lima's PM or RJR's confidences in a "substantially related matter" (R. Regulating Fla. Bar 4-1.10(b)) was abrogated as a matter of law by Lima's departure. After that event, the Ferraro Firm maintained, the firm's representation of the Cantas should be evaluated under Rule Regulating Florida Bar 4-1.10(c):

> (c) **Representing Interests Adverse to Clients of Formerly Associated Lawyer.** When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless:
>
> (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
>
> (2) any lawyer remaining in the firm has information protected by rules 4-1.6 and 4-1.9(b) and (c) that is material to the matter.

In June 2017, the trial court conducted an evidentiary hearing on the PM and RJR motions for disqualification of Lima and the Ferraro Firm. In a detailed 18-page order entered after the hearing, the trial court concluded that (a) <u>Caro</u> was

---

[4] The plaintiffs petitioned for certiorari and quashal of the disqualification order in the First District. The petition is pending; <u>Russ v. Philp Morris USA, Inc.</u>, No. 1D17-1847.

8

controlling authority,[5] as this Court had not rendered a controlling decision on the disqualification issues, and (b) Lima's departure did not change the analysis set forth in Caro. Based on those conclusions, the trial court granted the PM and RJR motions for disqualification. The trial court observed that Rule 4-1.10 "does not provide an express mechanism for curing that conflict," and that constructing the Rule as contended by the Ferraro Firm "would create adverse incentives by allowing law firms seeking an improper edge to hire conflicted attorneys, litigate disqualification, and then simply fire the conflicted attorneys after a court finds a conflict and imputes it to the law firm."

The Cantas' petition for certiorari followed.

II.   Analysis

A.   Petitioners' Burden

Certiorari "is the proper method to obtain review of a disqualification order because denying a party counsel of his or her choice is a material injury without appellate remedy." Event Firm, LLC v. Augustin, 985 So. 2d 1174, 1175 (Fla. 3d DCA 2008). But in addition to the "material injury without appellate remedy," the

_____

[5] By then, Lima and the Ferraro Firm had been disqualified by trial courts in the Ninth Circuit (Hall) and in two other pending Engle-progeny cases in the Second Circuit (Russ) and Seventeenth Circuit (Balaban v. Philip Morris USA, Inc., No. 14-14204(05)). The latter two decisions also relied upon the Fourth District decision in Caro as the only then-reported appellate decision in Florida and thus as binding authority. Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992).

9

Cantas and the Ferraro Firm[6] also have the burden of demonstrating a departure from the essential requirements of the law by the trial court. Coral Gables Chiropractic PLLC v. United Auto Ins. Co., 199 So. 3d 292, 294 (Fla. 3d DCA 2016); Steinberg v. Marlin, 201 So. 3d 129 (Fla. 3d DCA 2015).

B.    Issue Presented; Rule 4-1.10(c)

The narrow question before the trial court, and now us, is whether the imputed conflict in existence in this case from Lima's employment by the Ferraro Firm in mid-2015, through the Ferraro Firm's explicit notification of that conflict when the first PM Engle-related motions for disqualification were filed in March 2016, through the granting of such a motion in Hall in June 2016, through the appellate ruling requiring disqualification in Caro, and through March 2, 2017 (the last day of Lima's employment with the Ferraro Firm), has been cured by Lima's dissociation. Neither Rule 4-1.10 nor any reported Florida appellate opinion addresses that particular "midstream" sequence of events.[7]

---

[6] Although the PM and RJR motions sought, and the trial court granted, disqualification of Lima as well as the Ferraro Firm, Lima's departure from the firm mooted the issue as to him individually. The Cantas' petition is only directed to the disqualification of the Ferraro Firm.

[7] As noted by the trial court in its order, however, U.S. Bankruptcy Judge Thomas E. Baynes, Jr., considered the question in a conflict/disqualification opinion. "There does not appear to be any authority to cure a conflict that has arisen under Rule 4-1.10(b), by terminating association with a tainted lawyer." Harpley v. Ducane Indus. (In re Outdoor Prods. Corp.), 183 B.R. 645, 650 n.7 (Bankr. M.D. Fla. 1995).

Rule 4-1.10(c), relied upon by the Cantas and the Ferraro Firm, addresses a scenario in which a lawyer formerly associated with a law firm leaves the firm and "thereafter" the firm represents "a person with interests materially adverse to those of a client represented by the formerly associated lawyer." The use of the word "thereafter" may signify a new, post-dissociation representation, but does it apply to a lawsuit filed and prosecuted for a significant time before the dissociation, i.e., while a motion for disqualification would have been well taken?

The trial court's order applied the reasoning in Caro and concluded that the Ferraro Firm's conflict "cannot be 'unimputed' after the fact by the termination of Lima." The court turned to the analogous situation in which a law firm delays in enacting a so-called "Chinese wall" to screen or quarantine individual lawyers with a conflict. In doing so, the trial court acknowledged that Florida law does not recognize the concept of screening as an exception to the imputation of conflicts to all the lawyers in a firm, but noted that the American Bar Association Model Rules and other jurisdictions have authorized such a procedure. The court determined that in those cases, "setting up a Chinese wall retroactively is insufficient to cure a previously identified conflict," citing LaSalle Nat'l Bank v. Lake Cty., 703 F. 2d 252, 259 (7th Cir. 1983).

The trial court also found a New York opinion helpful:

[T]o rebut the presumption, the screening measures must have been established from the first moment the conflicted attorney transferred

11

to the firm or, at a minimum, when the firm first received actual notice of the conflict. See Marshall v. State of New York Div. of State Police, 952 F. Supp. 103, 111 (N.D.N.Y.1997) ("a screening device implemented only after a disqualified lawyer has been with a firm will not provide adequate protection of confidences"); Del–Val Financial, 158 F.R.D. at 274–75 (presumption rebutted partly on ground that the screening device was implemented immediately upon discovery of the conflict).

* * *

Timing also militates against upholding the efficacy of the screening measures adopted by [the law firm sought to be disqualified]. The record shows that the firm did not formally implement the screen until March 9, 2001, almost two months after [the new, conflicted lawyer] joined the firm and well after the time the firm had actual notice of the conflict. A screening device implemented only after a disqualified lawyer has joined the firm, in an instance where the firm knew of the problem at the time of her arrival, further diminishes the possibility that screening remedies the conflict present this case.

Mitchell v. Metro. Life Ins. Co., Inc., 2002 WL 441194, at *9-10 (S.D.N.Y. Mar. 21, 2002).

The trial court next addressed the two Florida cases relied upon by the Cantas and the Ferraro Firm interpreting Rule 4-1.10(c) after a law firm terminates a conflicted lawyer: Nissan Motor Corp. v. Orozco, 595 So. 2d 240 (Fla. 4th DCA 1992), and State Farm Mutual Automobile Insurance Co. v. Kugler, 2012 WL 12868733 (S.D. Fla. June 11, 2012). Although the courts in those cases held that disqualification was not required, the trial court in the present case found the Nissan Motor Corp. and State Farm cases to be distinguishable:

Neither case involved a situation where an appellate court had already imputed a conflict to the law firm, or where a conflicted lawyer had continued working on the matter while his law firm litigated

12

disqualification (and, indeed, even after the law firm had been disqualified by at least one trial court). Moreover, in both cases, the law firms terminated the conflicted lawyer <u>immediately</u> upon learning of a potential conflict. [Original emphasis].

Order Granting Defs.' Mot. to Disqualify, <u>Canta v. R.J. Reynolds Tobacco Co.</u>, No. 07-46972-CA-22, (Fla. 11th Jud. Cir. 2017), at 14.

The trial court's order concluded by addressing the policies underlying Rule 4-1.10:

> The Court recognizes that disqualification is an extraordinary and harsh remedy which should be used sparingly. However, law firms must bear some responsibility to determine the conflicts of new hires in advance and take proactive steps to prevent such problems. <u>See Koulisis v. Rivers</u>, 730 So. 2d 289, 292 (Fla. 4th DCA 1999) (placing the evidentiary burden "before the law firm that could have best avoided the ethical problem by more carefully screening a hiring decision").
>
> * * *
>
> "When defendants no longer have absolute faith that all confidential communication with counsel will remain forever inviolate, no candid communication will transpire, and the guarantee of effective assistance of counsel will become meaningless. <u>This is too high a cost for society to bear</u>." <u>Castro v. State</u>, 597 So. 2d 259, 260 (Fla. 1992) (citation omitted)(emphasis added). The circumstances here, including the fact that Lima continued to brief and argue appeals on <u>Engle</u>-progeny cases for a <u>full year</u> after the motions were filed (and the Firm was put on notice of the potential for disqualification), tip the balance in favor of disqualification. [Original emphasis].

Order, <u>supra</u>, at 15-17.

### C. The Preamble to the Rules

We can add little to the well-reasoned and detailed order entered by the trial court following the evidentiary hearing. But consistent with that order, we observe

13

first that this District has followed <u>Koulisis</u> for the proposition that the allocation of the burden of proof to the allegedly-conflicted law firm following a showing that the newly associated attorney acquired confidential information during his prior representation, as occurred here, "acknowledges the difficulty of proving what someone knows and places the procedural hurdle before the law firm that could have best avoided the ethical problem." <u>Gaton v. Health Coal., Inc.</u>, 745 So. 2d 510, 511 (Fla. 3d DCA 1999).

We also turn to the preamble to Chapter 4, "Rules of Professional Conduct," directed to all of the Rules discussed in this opinion. The preamble is titled, "A Lawyer's Responsibilities." Within that preamble we find these passages that should guide all lawyers, but seem particularly pertinent in the case of both (1) a lawyer "switching sides" in civil litigation who has acquired confidential information from a former client before joining a new firm that has a public record of pursuing a specific category of claims against that former client, and (2) a new firm which must know, or surely should know, that the new lawyer was with a firm that represented that former client for a course of years, and personally worked on that specific category of cases before the switch.

The preamble explains that "Within the framework of these rules . . . many difficult issues of professional discretion can arise. These issues must be resolved through the exercise of sensitive professional and moral judgment guided by the

basic principles underlying the rules. . . . The rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules." Although we reiterate that Florida has not accepted a so-called "Chinese wall" or "screening" process as a cure-all for lawyers who move to a new law firm with client confidences that might otherwise support disqualification in an existing or new representation by the new firm, the preamble's definition of "screening" is informative: "'Screening' denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these rules or other law."

Not only did the Ferraro Firm fail to initiate an inquiry and a screening process when Lima joined the firm in 2015, there is no indication that the firm removed Lima from work on Engle-progeny cases for a year after PM detailed the kinds of client confidences Lima's work had included before he switched sides. The preamble states that, "In order to be effective, screening measures must be implemented as soon as practicable after a lawyer or law firm knows or reasonably should know that there is a need for screening."

Neither Rule 4-1.10(c) nor the comments to the Rule directly address the firm's ability to continue in a matter "representing a person with interests

materially adverse to those of a client represented by the formerly associated lawyer" after the formerly associated lawyer has been terminated precisely because his presence resulted in disqualification in other "substantially related" matters. "Unimputing" a conflict seems as implausible as unringing a bell, unscrambling an omelette, or pushing toothpaste back into the tube.

## D. The Restatement (Third) of the Law Governing Lawyers

The petition argues that we should recognize and give effect to section 124, "Removing Imputation," of the Restatement (Third) of the Law Governing Lawyers (2000).[8] Section 124(1) provides that the imputation of prior client confidences (obtained at a prior firm by a "personally prohibited lawyer") "does not restrict an affiliated lawyer when the affiliation between the affiliated lawyer and the personally prohibited lawyer that required the imputation has been terminated, and no material confidential information of the client, relevant to the matter, has been communicated by the personally prohibited lawyer to the affiliated lawyer or that lawyer's firm." At first reading, that language seems to "remove" the imputed conflict when the "personally prohibited lawyer" (Lima, in this case) "has been terminated."

On a closer reading of comment c. to section 124, however, and an illustration provided within that comment, it seems clear that imputation is

_____

[8] Florida courts have regularly turned to the Restatement (Third) for guidance in cases involving the professional obligations of lawyers and law firms.

16

removed as to <u>prospective or new</u> representations following the termination of the personally prohibited lawyer:

> *c. Imputation after the termination of an affiliation.*
>
> *c.(i). Personally prohibited lawyer terminates the affiliation.* During the time that a personally prohibited lawyer is associated with another lawyer, law firm, or other organization to which prohibition is imputed under § 123, the lawyer could reveal confidential information to any lawyer within the organization. Accordingly, imputed prohibition of all lawyers in the firm is appropriately required by § 123. However, after the personally prohibited lawyer has left the firm, an irrebuttable presumption of continued sharing of client confidences or continued disloyalty induced by the affiliation is no longer justified.

* * *

**Illustration:**

> 1. Lawyer A is a partner in ABC law firm, and Lawyer B formerly was a partner. Client X has sought to retain Lawyer A to file suit on behalf of X against Y. Before joining the ABC firm, Lawyer B had represented Y at an earlier stage of the current dispute. Lawyer B has now resigned from the ABC firm, disclosed no confidential information about Y relevant to the matter to other lawyers in ABC, left no files at ABC that relate to the <u>proposed</u> suit, and will not share in fees derived by the ABC firm from the representation of X. The limitation governing B, resulting from the <u>proposed</u> representation being substantially related to the prior representation of Y by B (see § 132), is no longer imputed to A. Hence A may represent Client X against Y. (Emphasis provided).

The use of the term "proposed" representation conveys the important limitation on "removing" the imputation—once the "personally prohibited lawyer" has been terminated, a proposed new representation may be taken on by the formerly affiliated, remaining lawyers at the firm if the other conditions in section

17

123 are met. The provision does not address the continuance of an attorney-client relationship that already existed when the "personally prohibited lawyer" joined the firm, and following an extensive period of imputation that would have, pre-termination, warranted disqualification of the firm.

III.    Conclusion

Reviewing a record that is devoid of any proactive effort by the Ferraro Firm to thoroughly and expeditiously investigate any possible conflicts with PM or RJR based on Lima's prior work, at the outset of their association, or even ten months later when PM and RJR detailed in writing the existence and nature of the conflict, we agree with the trial court that "law firms must bear some responsibility to determine the conflicts of new hires in advance and take proactive steps to prevent such problems." Order, supra, at 15.

Following our thorough review of the record below, the trial court's order, the briefs and authorities cited by the parties, and oral argument by counsel, we do not find a departure from the essential requirements of law.

Petition denied.